THE PASSAIC DAILY NEWS, A CORPORATION OF NEW JERSEY, PLAINTIFF-APPELLANT, TRENTON TIMES CORPORATION, INTERVENOR-APPELLANT, v. JAMES H. BLAIR, DIRECTOR OF THE DIVISION ON CIVIL RIGHTS OF THE STATE OF NEW JERSEY, AND GEORGE F. KUGLER, JR., ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Argued February 21, 1973—Decided August 8, 1973.

*Mr. Martin Klughaupt* argued the cause for appellant The Passaic Daily News.

*Mr. Richard J. S. Barlow, Jr.* argued the cause for appellant Trenton Times Corporation (*Messrs. Lenox, Giordano, Devlin & Barlow,* attorneys).

*Mr. Morgan R. Seiffert* argued the cause for *Amicus Curiae,* New Jersey Press Association.

*Mr. David S. Litwin,* Deputy Attorney General, argued the cause for respondents (*Mr. George F. Kugler, Jr.,* Attorney General, attorney; *Mr. David H. Ben-Asher,* Deputy Attorney General, on the Brief).

The opinion of the Court was delivered by

CONFORD, P. J. A. D., Temporarily Assigned. This case concerns the validity of the Employment Advertising Rule, *N. J. A. C.* 13:11–1.1 *et seq.,*[1] adopted by the Director of the Division on Civil Rights in the Department of Law and Public Safety. Appellants Passaic Daily News and Trenton Times challenge the Rule on the ground that it incorrectly interprets the Law Against Discrimination, *N. J. S. A.* 10:

---

[1] Set forth substantially entirely in the Appendix at the foot of this opinion.

5–1 *et seq.*, to hold newspapers responsible for violation of the law by maintaining classified advertising employment columns which are segregated on the basis of sex and by publishing classified employment advertisements submitted by advertisers which express illegal discriminatory limitations. The New Jersey Press Association, as *amicus curiae*, supports the arguments made by the appellants, and contends additionally that the Rule is unconstitutional, primarily on the ground that it abridges the freedom of the press guaranteed by the First and Fourteenth Amendments of the federal Constitution.

This action originated as a suit brought by Passaic Daily News in the Law Division of the Superior Court against the Director and the Attorney General. The newspaper sought in part a declaratory judgment that its classified advertising format, which included separate "help wanted" columns designated "male", "female" and "male-female", was in conformity with the Law Against Discrimination. About two weeks after the suit was filed the Director published in the New Jersey Register a notice of intention to adopt the Rule and at the same time the Attorney General moved to dismiss the complaint, or, in the alternative, to stay the action until the Director had taken action on the proposed Rule. The Passaic Daily News then moved for summary judgment, and the trial court reserved decision on both motions on March 30, 1972.

On April 3 and 4, 1972 the Director conducted public hearings on the proposed Rule. He subsequently adopted the Rule with certain modifications. Thereafter, the Law Division held that it was without jurisdiction over the subject matter of the complaint and it transferred the case to the Appellate Division "as an appeal challenging the validity of the Employment Advertising Rule. . . ." See *R.* 2 :2–3 (a). The Appellate Division granted Trenton Times Corporation leave to intervene in the appeal and stayed enforcement of the Rule pending determination of the appeal. On motion of the Attorney General this Court certified the case before argu-

ment in the Appellate Division. 62 *N. J.* 187 (1972). The New Jersey Press Association was granted leave to submit a brief and argue the cause as *amicus curiae.*

The Employment Advertising Rule interprets the Law Against Discrimination, particularly *N. J. S. A.* 10 :5–12, subds. a., c., and e., to prohibit employers, employment agencies, unions and newspapers or other publications from publishing or causing to be published classified employment advertisements under a column heading which is segregated on the basis of race, creed, color, national origin, ancestry, age, sex or marital status. *N. J. A. C.* 13 :11–1.3. In addition, the Rule declares that it is a violation of the act for an employment advertisement to be published by any of the above if it expresses in its text a direct or indirect preference based on any of the said prohibited criteria unless such preference is based on a "bona fide occupational qualification". *N. J. A. C.* 13 :11–1.1, 13 :11–1.4. This exception is described as including only those vocational qualifications which are "reasonably necessary" to the normal operation of the particular employer, and is to be interpreted so that individuals will be considered for employment on the basis of their individual capacities and not on the basis of any characteristics generally attributable to a particular group of people. *N. J. A. C.* 13 :11–1.5. The Rule provides that the exception for a sex-classification "may be warranted where it is necessary for authenticity or genuineness, such as for an actor or actress, or where the job in question necessarily involves intimate personal contact with persons of the opposite sex". *Ibid.*

The Rule also requires the Division to respond to inquiries as to whether a particular job qualifies for a bona fide occupational qualification in respect of one of the ordinarily illegal preference criteria. The Division's responses are to be made "promptly, and whenever possible no later than two hours after the inquiry is received". *N. J. A. C.* 13.11–1.6. If a newspaper reasonably relies in good faith on the representation of its advertiser that the Division has

determined that the job has a bona fide occupational qualification, the newspaper will not be in violation of the Rule for printing the advertisement. Opinions given by the Division concerning bona fide occupational qualifications "shall be binding for the purpose of these provisions", unless the person seeking the opinion has not fully and accurately disclosed the relevant facts. *Ibid.*

The Rule contains guidelines for composition of "help wanted" advertisements. *N. J. A. C.* 13:11–1.4. These provide, *inter alia*, that except where sex is a bona fide occupational qualification ("bfoq", hereafter) the job title used in an advertisement must be neutral in respect of sex. If use of a neutral title is not practicable the advertisement must either include the job title which is the sex counterpart of the non-neutral title or the description "M/F". Illustrations are set forth in the text of the rule, *e. g.*, "Salesman" is a prohibited term; permissible substitutes are "Salesperson", or "Salesman/woman" or "Salesman M/W". *Ibid.*

The appellant newspapers make these arguments against the validity of the Rule: (a) it is beyond the Division's rule-making authority insofar as it applies to newspapers since the statutory provision prohibiting discriminatory advertisements, *N. J. S. A.* 10:5–12 subd. c., mentions action only by "any employer or employment agency", and not newspapers; (b) the practice of sex-segregated column headings is not in fact discriminatory; (c) the Rule imposes an unreasonable burden on newspapers to determine whether a particular advertisement containing a gender requirement is justified on grounds of bfoq.

The *amicus,* while supporting appellants on the grounds mentioned, assails the regulation also as unconstitutional because impairing freedom of the press and in several other respects. In view of the very recent decision of the United States Supreme Court in *Pittsburgh Press Co. v. The Pittsburgh Commission on Human Relations,* —— *U. S.* ——,

93 S. Ct. 2553, 37 L. Ed. 2d 669 (1973) it will be convenient to deal initially with the First Amendment issue.

## I.

■ A comparison of the facts in *Pittsburgh Press* and those before us here reveals such substantial similarity as to render the decision in that case conclusive here on the issue of freedom of the press. Pittsburgh's anti-discrimination ordinance provided in Section 8(e) that it was unlawful for "any employer, employment agency or labor organization to publish or circulate, or to cause to be published or circulated" any advertisement indicating any discrimination because of race, color, religion, ancestry, national origin or place of birth, or sex. (Compare *N. J. S. A.* 10:5-12, subd. c.) Section 8(j) of the ordinance made it also unlawful for "any person, whether or not an employer, employment agency or labor organization, to aid, incite, compel, coerce or participate" in the doing of any unlawful discriminatory act. (Compare *N. J. S. A.* 10:5-12, *subd.* e.) The Pittsburgh Commission on Human Relations was required, under another section of the ordinance, to certify upon request of any person that a particular occupation or position was exempt from the ordinance provisions on grounds similar to those supporting a bfoq exemption.

On a complaint brought by the National Organization for Women, the Pittsburgh Commission on Human Relations found that the Pittsburgh Press "aided" employers and others in discriminating against women through a classified advertising format consisting of three separate columns headed, "Jobs-Male Interest", "Jobs-Female Interest", and "Male-Female Help", although a "disclaimer" notice was also printed. The NOW complaint did not allege any specific instance of discrimination, and indeed the record showed that the newspaper had — after conferring with the Commission — voluntarily attempted to eliminate the terms "male" and "female" in the body of employment

advertisements. See *Pittsburgh Press Co. v. Pittsburgh Com'n on Hum. Rel.,* 4 *Pa. Cmwlth.* 448, 287 *A.* 2d 161, 164 (Cmwlth. Ct. 1972). The Commission's determination was thus limited to a finding that the classified format described above aided discrimination *per se.* The Commission's decision was affirmed on appeal in the Court of Common Pleas, and then, by a 4-2 vote, affirmed with a modification not here significant in the Commonwealth Court. The Pennsylvania Supreme Court denied review.

The United States Supreme Court granted certiorari, and, in a 5-4 decision upheld the action of the Pennsylvania authorities as not violative of freedom of the press. The argument presented there and here is that a governmental regulation interfering with "editorial judgment" as to the make-up of advertising pages operates to cut into the freedom to publish as the newspaper sees fit and thereby abridges freedom of the press. The court rejected the contention, describing the advertisements as "commercial speech" as explicated in *Valentine v. Chrestensen,* 316 *U. S.* 52, 62 S. Ct. 920, 86 L. Ed. 1262 (1942), and since they were of an illegal character, held them beyond First Amendment immunity from prosecution pursuant to a state police-power regulation.

*Pittsburgh Press* is directly applicable and determinative as to the constitutional issue presented here. The Rule under review is not invalid as abridging freedom of the press.

## II.

The core question on this appeal is whether the comprehension by the Employment Advertising Rule of newspapers within its scope is beyond the Division's rule-making power measured by the statute. In resolving that issue we will also deal with the appropriateness of the general prohibition therein of sex-segregated advertising columns.

We look first at the pertinent substantive provisions of the statute. *N. J. S. A.* 10:5-12, subd. a. declares it to be

an unlawful employment practice for an employer, because of race, creed, color, etc., marital status or sex to refuse to hire or employ an individual except, as to sex, "in those certain circumstances where sex is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business or enterprise". *N. J. S. A.* 10: 5–12, subd. c. makes it an unlawful employment practice or discrimination "for any employer or employment agency" to print or circulate any advertisement which expresses, directly or indirectly, any specification as to race, creed, color, etc., marital status or sex "unless based upon a bona fide occupational qualification". *N. J. S. A.* 10:5–12, subd. e. extends the declaration of unlawfulness contained in the other subparagraphs of *N. J. S. A.* 10:5–12 to the act of any person "whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so".

*N. J. S. A.* 10:5–3 sets forth a legislative finding and declaration that practices of discrimination because of race, creed, color, etc., sex or marital status "are a matter of concern to the government of the State, and that such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State".

*N. J. S. A.* 10:5–4 declares it to be a "civil right" that all persons have the opportunity to obtain, *inter alia,* employment, without discrimination because of race, creed, color, etc., marital status or sex, "subject only to conditions and limitations applicable alike to all persons".

*N. J. S. A.* 10:5–6 creates "The Division on Civil Rights" in the Department of Law and Public Safety "with power to prevent and eliminate discrimination in the manner prohibited by this act against persons because of race, creed, color", etc., "marital status or sex". *N. J. S. A.* 10:5–8, subd. d. authorizes the Attorney General to appoint a Director of the Division on Civil Rights who may exercise the power of the Attorney General under *N. J. S. A.* 10:5–8,

subd. g. to "[a]dopt, promulgate, amend, and rescind suitable rules and regulations to carry out the provisions of this act".

All of the foregoing statutory references to discrimination on the basis of marital status or sex are attributable to amendment of the statute by *L.* 1970, *c.* 80 which added those categories to the Law Against Discrimination. This amendment was the result of a growing consciousness across the country, significantly represented by the anti-sex discrimination provisions of Title VII of the Civil Rights Act of 1964, 42 *U. S. C.* § 2000e–2 and 3, that females were and are pervasively discriminated against in American society in respect of employment and promotional opportunities, with consequences not solely of injustice on an individual basis but also of injury to the national welfare in terms of the most advantageous deployment of available skills and talents in the professional and general work force. See Note, "Employment Discrimination and Title VII of the Civil Rights Act of 1964", 84 *Harv. L. Rev.* 1109, 1166–68 (1971); *Murray & Eastwood,* "Jane Crow and the Law: Sex Discrimination and Title VII", 34 *Geo. Wash. L. Rev.* 232 (1965); Note, 59 *Georgetown L. J.* 221 (1970); Boyer, "Help-Wanted Advertising — Everywoman's Barrier", 23 *Hastings L. J.* 221 (1971); Kanowitz, "Sex-Based Discrimination in American Law, I", 11 *St. Louis University L. J.* 293, 326–330 (1967); Kanowitz, "Sex-Based Discrimination in American Law, III", 20 *Hastings L. J.* 305 (1968); Gardner, "Want-Ads Tomorrow: Neutral With Respect to Sex", in *Hearings on Section 805 of H. R. 16098 Before the Special Subcom. on Educ. of the Comm. on Educ. and Labor,* 91st Cong., 2d Sess. pt. 2, at 894, 896 (1970); Bem & Bem, "Sex Segregated Want Ads: Do They Discourage Female Job Applicants?" in Hearings, *op. cit. supra,* 891 *et seq.; Cf. Paterson Tav. & Grill Owners Assn. v. Bor. of Hawthorne,* 57 *N. J.* 180, 183–184, 189 (1970).

██ This court has heretofore adopted a broadly sympathetic construction of the Law Against Discrimination and has interpreted the provisions thereof pertaining to the remedial powers of the Division on Civil Rights and the Director thereof with that high degree of liberality which comports with the preeminent social significance of its purposes and objects. See *Jackson v. Concord Company*, 54 *N. J.* 113 (1969); *N. J. Builders, Owners and Managers Association v. Blair*, 60 *N. J.* 330, 339 (1972); *Polk v. Cherry Hill Apartments, Inc., et als.*, 62 *N. J.* 55 (1972); *Zahorian v. Russell Fitt Real Estate Agency*, 62 *N. J.* 399 (1973). We are, moreover, warranted in placing considerable weight on the construction of the statute, represented by the Rule under review, by the administrative agency charged by the statute with the responsibility of making it work. See *Griggs v. Duke Power Co.*, 401 *U. S.* 424, 433–434, 91 S. Ct. 849, 28 L. Ed. 2d 158 (1971); *Weeks v. Southern Bell Telephone & Telegraph Company*, 408 *F.* 2d 228, 235 (5 Cir. 1969); 1 *Davis, Administrative Law Treatise* § 5.05, p. 314 (1958).

Although appellants quarrel with the wisdom and policy of the Rule provisions against sex-segregated advertising column headings on the purported basis that minority individuals, asserted to be unskilled in reading, find it easier to discover jobs appropriate to their gender under such listings, they do not and could not well assert that there is no causal relationship between the proscribed practice and the fostering of sex-discrimination in employment. Such a relationship is not only a matter of justifiable lay inference on the face of things, it is abundantly supported by convincing expert proofs adduced before the Director on the hearings antecedent to adoption of the Rule and by the copious literature on the subject, examples of which have been cited hereinabove.

Further support for the merit of administrative proscription of sex-segregated columns in employment advertising

is afforded by the guideline on this subject adopted by the federal Equal Employment Opportunity Commission, charged with implementation of Title VII of the Civil Rights Act of 1964. This declares that: "The placement of an advertisement in columns classified by publishers on the basis of sex, such as columns headed 'Male' or 'Female', will be considered an expression of a preference, limitation, specification or discrimination based on sex." 29 *C. F. R.* § 1604.5 (1968). Such preference, etc. is illegal unless based on a bfoq. 42 *U. S. C.* § 2000e–2(e). Other state administrative agencies in this field have adopted similar proscriptions of sex-segregated column headings in employment advertising. See *Iowa Civil Rights Comm'n Guidelines on Sex Segregated Want Ads, CCH Emp. Prac. Guide* § 22,875; *Minnesota State Dept. of Human Rights Sex Discrimination Guidelines, Id.,* § 24,409.06. The record indicates, moreover, that many leading newspapers here and elsewhere have voluntarily discontinued that format of employment advertising.

We thus have no difficulty whatever in concluding that sex-segregated column headings are promotive of discrimination in employment on the basis of sex and therefore are properly forbidden by administrative rule.

The only substantial argument presented by appellants in support of the thesis of absence of administrative power to promulgate the Rule is the point that the coverage by the Rule of newspapers within its purview is contrary to the legislative intent, as demonstrated by the fact that *N. J. S. A.* 10:5–12, subd. c., the provision expressly dealing with publication of advertisements for employment, mentions only employers and employment agencies as subject to the proscription enacted therein, not newspapers or other *media* of publication. The Attorney General counters by pointing to the prohibition in *N. J. S. A.* 10:5–12, subd e. of the aiding or abetting by "any person, whether an employer or employee, or not", of the doing of

any act forbidden by the statute. He contends that by making available the advertising columns of its newspaper the publisher is aiding the employer or employment agency placing the advertisement in discriminating in employment on the basis of sex to the same extent that the advertiser is itself guilty of a violation of the act in seeking its publication. Thus, so goes the argument, where the publisher arranges sex-segregated column headings on its help-wanted pages for the convenience or at the request of its advertisers or prints an advertisement the body of which contains an illegal designation of a sex qualification for the position, the publisher has aided the advertiser in violating the act.

The position of the Attorney General finds support in the rulings by the Pennsylvania courts in the Pittsburgh Press litigation recently concluded by the decision of the United States Supreme Court mentioned in I, above. *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations, supra.* We have hereinabove outlined the background of that case, indicating that the local administrative agency found the newspaper to have aided the employers and others in discriminating against women by maintaining sex-preference headings in its advertising columns, and thus to have violated a provision of the ordinance prohibiting aiding or abetting a discriminatory act, couched in language much the same as our own statute. In finding that the newspaper's classified format did "aid" employers to discriminate, the Commonwealth Court said:

This is not a matter of whether the Pittsburgh Press intentionally conspired with some employer or employers to discriminate against women. What is of importance is that through the use of its arbitrarily selected column headings the Pittsburgh Press 'aids' such employers to discriminate. When the Pittsburgh Press arbitrarily arranges and publishes such column headings it is aiding in sex discrimination. The ruling that employment want ad column headings be written asexually is appropriate because it eliminates the difficulties of evaluating sophisticated medical, sociological, and actuarial theories of aggregate differences between the sexes. It is proper because it represents the highest degree of societal commitment to the ideal of legal sexual equality. Perhaps more importantly, asexual employment

advertising column headings will aid in guaranteeing women their fundamental right to be hired and judged on the basis of individual characteristics and capabilities. 287 *A.* 2d at 169.

At another point, the court rejected the analogy, also made in the present case, to the newspaper's freedom from liability for the publication of false advertising:

We feel compelled to reject the analogy for the reason that the maintenance of segregated column headings in and of themselves is indicative of a newspaper's participation in an illegal discriminatory scheme. On the other hand, the simple publication of a particular advertisement later found to be false, without proof of complicity, actual or constructive, casts no shadows of liability onto a newspaper. *Ibid.*

The court affirmed the Commission's order as modified in certain technical respects not here pertinent.

We find the reasoning of the Pennsylvania court persuasive. So apparently did also the United States Supreme Court. In rejecting the newspaper's claim of First Amendment protection for its "editorial" function in heading its advertising columns by indication of sex preference, Mr. Justice Powell said:

As for the present case, we are not persuaded that either the decision to accept a commercial advertisement which the advertiser directs to be placed in a sex-designated column or the actual placement there lifts the newspaper's actions from the category of commercial speech. By implication at least, an advertiser whose want-ad appears in the "Jobs—Male Interest" column is likely to discriminate against women in his hiring decisions. Nothing in a sex-designated column heading sufficiently dissociates the designation from the want-ads placed beneath it to make the placement severable for First Amendment purposes from the want-ads themselves. The combination, which conveys essentially the same message as an overtly discriminatory want-ad, is in practical effect an integrated commercial statement.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Section 8(j) of the Ordinance, the only provision which Pittsburgh Press was found to have violated and the only provision under attack here, makes it unlawful for "any person . . . to aid . . . in the doing of any act declared to be unlawful by this ordinance." The Commission and the courts below concluded that the practice of placing

want-ads for nonexempt employment in sex-designated columns did indeed "aid" employers to indicate illegal sex preferences. The advertisements, as embroidered by their placement, signaled that the advertisers were likely to show an illegal sex preference in their hiring decisions. Any First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity. —— U. S. at ——, 93 S. Ct. at 2560, 37 L. Ed. 2d ——.

It seems to us that the prominent, if not indispensable place of newspaper classified advertising in the employment recruiting field is such that it is unrealistic to contend that a publisher of a paper who either initiates or acquiesces in advertising publication practices which discriminate or encourage or facilitate discrimination in employment is not "aiding" in such discrimination within the meaning of the statute. To borrow, as do appellants, from definitions of aiding and abetting in the criminal field, where criminal intent is stressed because the abettor is a criminal principal, is entirely inappropriate in the context of the present statute which is basically a remedial, not a criminal one. A violation of the Law Against Discrimination is not made criminal *per se.* Guilt of a misdemeanor arises only where a person willfully resists or impedes the Attorney General or a representative of the Division in the performance of duty under the act or willfully violates an *order* (note, not a rule or the statute) of the Attorney General or the Director. *N. J. S. A.* 10:5–26.

To accept appellants' argument and confine enforcement and implementation of the policy of the act to rules and sanctions invocable only against employers and employment agencies would be to deprive the Attorney General and the Director of a most effective and logical tool for vindicating the policy of the statute insofar as discrimination in employment is concerned. We will not adopt such a course here, especially where confronted with statutory language in *N. J. S. A.* 10:5–12, subd. e. which *prima facie* points

the other way. See *N. J. Builders, Owners and Managers Association v. Blair, supra* (60 *N. J.* at 339).

Appellants rely on *Brush v. San Francisco Newspaper Printing Company,* 315 *F. Supp.* 577 (N. D. Calif. 1970), affirmed substantially o. b. 469 *F.* 2d 89 (9 Cir. 1972). There the court held that Congress did not intend newspapers to be subject to the sanctions of Title VII of the Civil Rights Act of 1964 for publishing employment advertisements in sex-segregated columns. However, the federal law does not include an "aiding and abetting" provision; the holding of the *Brush* decision is thus merely that a newspaper is not an "employment agency" as defined in the Civil Rights Act, the court noting that the sections of the law under examination were not made broadly applicable to all "persons" but only to any "employer, labor organization, or employment agency." 42 *U. S. C.* 2000e–3(b). 315 F. Supp. at 582. Moreover, the court's conclusion was also supported by legislative history indicating that the bill's principal congressional supporters did not intend newspapers to be included within the statutory regulations for printing advertisements. See 315 *F. Supp.* at 582.

Appellants cite also in support of their position two recent New York decisions holding that newspapers are not aiders and abetters when they maintain sex segregated classified columns. *Nat. Org. for Women v. Buffalo Courier-Exp., Inc.,* 71 *Misc.* 2d 917, 337 *N. Y. S.* 2d 608 (Sup. Ct. 1972); *National Org. for Women v. Gannett Co. Inc.,* 40 *A. D.* 2d 107, 338 *N. Y. S.* 2d 570 (App. Div. 1972). Although the New York legislation is very similar to our statute, the precedential force of the cases cited is lessened by the circumstance that the New York administrative agency charged with enforcement of the statute, the State Division of Human Rights, had promulgated an interpretive rule that a newspaper maintaining sex-segregated columns would not be in violation of the statute if it published a notice

that the practice was only for the convenience of the reader and not intended as an unlawful discrimination. The New York courts were entitled, of course, to give weight to the interpretation of the act by the enforcing agency of that State, an interpretation which happens to be different from that of our agency.

In the *Gannett* case, *supra,* the New York Appellate Division undertook to distinguish the *Pittsburgh Press* case, *supra,* on the basis that the Pittsburgh ordinance specifically provided for a procedure whereby the press could determine whether or not a bfoq existed for a particular job. Upon inquiry by a newspaper, the local commission was under a duty pursuant to the ordinance to certify whether the bfoq existed. (338 *N. Y. S.* 2d at 579) If the implication of the New York court is that a comparable advisory service in that state would have altered the determination of the court (as to which the opinion is unclear), we point to the fact that the instant Rule, in *N. J. A. C.* 13:11–1.6, does provide for such an advisory service, reliance on which protects the newspaper.

To the extent that the New York decisions cited may not be distinguishable from the situation here presented for the reasons stated above or otherwise, we decline to follow them as not in accord with our own views as to the breadth of the approach which the judiciary should take in support of the objectives of this species of legislation.

We conclude that the coverage by the Employment Advertising Rule of newspapers was within the legislative delegation of rule-making power to the Director and that the general prohibition therein of sex-segregated columns in employment advertising is reasonable and valid.

### III.

Appellants contend, additionally, that even if application of the Rule to newspapers is within the statutory jurisdiction of the Director, and sex-segregated advertising columns

may be forbidden, the Rule is nevertheless arbitrary, unreasonable and unduly burdensome for compliance by newspapers and for those reasons should be invalidated.

■ Preliminarily, we respond to appellants' complaint that *N. J. A. C.* 13 :11–1.3, prohibiting maintenance of sex-segregated columns, is defective in not providing an exception for a column consisting *solely* of positions lawfully restricted to a particular sex on the basis of bfoq. It may first be observed that in view of the narrowness of a bfoq the occasion for printing an entire newspaper column of legally permissible sex-preference job advertisements would be so rare as to be *de minimis*. But more importantly, the absolute rule prohibition is justified, under the public policy of the statute, for the reason that the publicized availability of sex-segregated columns in newspapers might encourage advertisers to attempt to evade the strict statutory limitations of permissible sex-preference expressions. The affirmative statutory exception for a bfoq does not extend beyond the content of the body of a particular advertisement.

■ Appellants' more substantial aggrievement concerns the effect of *N. J. A. C.* 13 :11–1.4 on newspaper practices in relation to the body of a help-wanted advertisement. That rule prohibits the expression in the body of an advertisement of a preference for, *inter alia,* a given sex unless such preference constitutes a bfoq for the particular job advertised. The gravamen of the grievance is the allegedly unwarranted burden to which the newspaper staff is subjected in having to screen every such advertisement (a) to determine if it expresses a sex-preference and (b) if it does, to determine whether there is an exempting bfoq. As to the first concern, we see no real problem in the light of the clear guidelines expressed in the Rule. As to the second, the argument advancd deprecates the significance of the availability of advisory opinions from the Division as to bfoq, as provided for in *N. J. A. C.* 13 :11–1.6. It is contended that the service will not be of practicable utility to the newspaper because of the disparity between the hours the Division office is open for

inquiries and those in which the newspaper staff is handling want-ads, the latter frequently involving nights and weekends when Division offices are not open.

We do not accept the contention. We assume the Division offices will be open during regular government office hours. In view of the narrowness of the bfoq exception expressed in the Rule, fully justified by the authorities, and the lucid explanation in the Rule of permissible and proscribed advertising practices, need for resort to advisory opinions from the Division may be expected not to be extensive. Continued experience with the Rule should minimize any initial inconvenience sustained by newspapers or advertisers therewith.

The recital in *N. J. A. C.* 13 :11-1.5 that the bfoq exception "shall be interpreted so that individuals will be considered for employment on the basis of their individual capacities and not on the basis of any characteristics generally attributable to their group", as further refined in that section by reference to such specifically disapproved criteria as turnover rate and stereotyped characteristics of various types, finds wide support in the federal cases construing the bfoq provisions of Title VII of the Civil Rights Law of 1964. Such support is also found in the substantially similar guideline as to bfoq adopted by the federal Equal Employment Opportunity Commission in administering that act. 29 *C.F.R.* § 1604.2 (1968). See *Weeks v. Southern Bell Telephone & Telegraph Company, supra* (408 *F.* 2d 228) (involving employer discrimination against female job applicant on assumed inability to lift 30 pounds; bfoq claim requires employer to show that "all or substantially all" women would be unable to perform job, *Id.* at 235) ; *Bowe v. Colgate-Palmolive Company,* 416 *F.* 2d 711 (7 Cir. 1969) (rejecting state regulation of maximum weight allowed to be lifted by women as insufficient basis for bfoq under civil rights act; pointing out that most state weight limits for women "would be considered clearly unreasonable in light of the average physical development, strength and stamina of most modern American women who participate in the industrial work force". Id. at 717) ; *Rosen-*

*feld v. Southern Pacific Company*, 444 *F.* 2d 1219 (9 Cir. 1971) (relying upon guideline fixed by Equal Employment Opportunity Commission for enforcement of federal Civil Rights Act of 1964, which defines bfoq in substantially similar way as the Rule here under review; statement by court that "equality of footing [between the sexes] is established only if employees otherwise entitled to the position, whether male or female, are excluded only upon a showing of individual incapacity", *Id.* at 1225) ; *Diaz v. Pan Am. World Airways, Inc.*, 442 *F.* 2d 385 (5 Cir. 1971), *cert.* den. 404 *U. S.* 950, 92 S. Ct. 275, 30 *L. Ed.* 2d 267 (1971) (invalidating airline rule excluding males for position of cabin flight attendant on passenger aircraft). See also *Annot.*, 12 *A. L. R. Fed.* 15, at 104 *et seq.* (1972).

We have stressed the narrowness of the bfoq exception to the illegality of sex preferences in employment advertising to indicate the basis for our opinion that, by and large, newspaper staffs handling advertising copy should have negligible difficulty in screening advertisements for legality. As noted above, the task should become easier as experience in the matter grows; and in close cases the newspaper can require Division clearance before publication. The importance in the public interest of the objective of the Rule overcomes any incidental inconvenience the newspaper business may be subjected to in complying with it.

Miscellaneous other grounds of attack on the Rule are set forth in the brief of the *amicus curiae*. We find them without merit and not to require discussion.

We find the Rule in question, as construed above, to be fair, reasonable and valid. The action of the Director in adopting the Employment Advertising Rule is affirmed.

### APPENDIX
13 :11–1.1 Employment advertising generally

(a) It shall be a violation of the Law Against Discrimination, N. J. S. A. 10 :5–1 *et seq.*, and more particularly, N. J. S. A. 10 :5–12(a), (b), (c) and (e), for any employer, union or employment agency, or any newspaper or other publication published or circulated within this State to print, publish or circulate any advertisement re-

lating to employment, employment opportunities, job openings, union membership, apprentice programs, job training programs or any of the terms, conditions or privileges thereof which expresses, overtly or subtly, directly or indirectly, any limitation, specification, preference or discrimination based on race, creed, color, national origin, ancestry, are, marital status or sex, or any intent to make such limitation, unless based on a *bona fide* occupational qualification.

(b) The use of language including but not limited to "Black", "Negro", "colored", "white", "restricted", "interracial", "segregated", "Christian", "Jewish", "men", "women", "girl", "boy", "gal", "guy", "married", "single" or any other word, term, phrase or expression which tends to influence, persuade or dissuade, encourage or discourage, attract or repel, any person or persons because of race, creed, color, national origin, ancestry, age, marital status or sex shall be considered discriminatory advertising in violation of the Law Against Discrimination, N. J. S. A. 10 :5–1 *et seq.*

\*  \*  \*  \*  \*  \*  \*  \*

13 :11–1.3   Maintenance of segregated columns

It shall be a violation of the Law Against Discrimination for any employer, union or employment agency or any newspaper or other publication published or circulated within this State to publish, print or circulate or cause to be published, printed or circulated any advertisement relating to employment, employment opportunities, job openings, union membership, apprentice programs, job training programs or any of the terms, conditions or privileges thereof under an employment advertisement column which is segregated on the bases of sex, marital status, race, creed, color, national origin, ancestry or age or under any column heading which expresses overtly or subtly, directly or indirectly, any preference, specification or limitation.

13 :11–1.4   Preferences expressed in body of advertisement appearing under joint "Men and Women" columns

(a) It shall be a violation of the Law Against Discrimination for any employer, union or employment agency, or any newspaper or other publication published or circulated within this State to publish, print or circulate or cause to be published, printed or circulated any advertisement relating to employment, employment opportunities, job openings, union membership, apprentice programs, job training programs, or any of the terms, conditions or privileges thereof the language of which advertisement expresses any limitation, specification, discrimination or preference as to sex, marital status, race, creed, color, national origin, ancestry or age of any intent to make such preference, specification or discrimination unless sex, marital status, race, creed, color, national origin, ancestry or age is a *bona fide* occupational qualification for the particular job advertised.

(b) Whenever a "help wanted" advertisement is to contain any job title or job description which is not clearly neutral in terms of sex and the job advertised is not one for which sex is a *"bona fide occupational qualification"* as defined in these provisions, then the

advertisement should instead utilize a neutral job title whenever practicable.

(c) If the use of a neutral job title is not practicable, then the advertisement may contain 'the non-neutral job title provided, however, that the advertisement also includes:

1. The job title which is the sex counterpart of the non-neutral job title; or

2. The designation "M/W".

(d) Newspapers which print employment advertisements are encouraged to voluntarily print a box on their employment advertising page indicating that the abbreviation "M/W" when used means "men or women".

| Examples of Prohibited Terms | Examples of Permissible Substitutes |
|---|---|
| "Salesman" | "Salesperson" or "Salesman/women" or "Salesman M/W" |
| "Waiter" | "Waiter/waitress" or "Waiter M/W" |
| "Gal Friday" | "General Office Work" or "Gal/guy Friday" or "Gal Friday M/W" |
| "Hostess" | "Hostess/host" or "Hostess M/W" |
| "Pressman" | "Press operator" or "Pressman/woman" or "Pressman M/W" |

(e) The fact that a term does not appear in the above partial list does not mean that such a term is acceptable.

13:11–1.5  *Bona fide* occupational qualification exception; application

(a) For the purposes of these provisions, the *"bona fide* occupational qualification" exception shall include only those vocational qualifications which are reasonably necessary to the normal operation of the particular business, enterprise or apprentice or other training program.

(b) The exception shall be interpreted so that individuals will be considered for employment on the basis of their individual capacities and not on the basis of any characteristics generally attributable to their group.

(c) The employer, employment agency or union has the burden of establishing that race, creed, color, national origin, ancestry, age, marital status or sex is a *bona fide* occupational qualification.

(d) The application of the exception is not warranted where based on, for example:

1. Assumptions of the comparative general employment characteristics of persons of a particular race, creed, color, national origin, ancestry, age, sex or marital status, such as their turnover rate;

2. Stereotyped characteristics of the aforementioned classes, such as their mechanical ability or aggressiveness;

3. Customer, client, co-worker or employer preference, or historical usage, tradition or custom;

4. The necessity of providing separate facilities of a personal nature, such as rest rooms or dressing rooms.

(e) In regard to sex, the application of the exception may be warranted where it is necessary for authenticity or genuineness, such as for an actor or actress, or where the job in question necessarily involves intimate personal contact with persons of the opposite sex.

13:11-1.6  Ruling by Division on *bona fide* occupational qualifications for particular jobs

(a) Any employer, union, employment agency, newspaper or other publication may make an inquiry of the Division on Civil Rights (at 1100 Raymond Boulevard, Newark, New Jersey 201-648-2700; or 436 East State Street, Trenton, New Jersey 609-292-4605; or 530 Cooper Street, Camden, New Jersey 609-964-0011; or 370 Broadway, Paterson, New Jersey 201-345-1465) as to whether race, creed, color, national origin, ancestry, age, sex or marital status is a *bona fide* occupational qualification for a particular job which they intend to publish,, print or circulate or cause to be published, printed or circulated.

(b) The Division shall promptly, and whenever possible no later than two hours after the inquiry is received, give opinions in response to such inquiries.

(c) An opinion rendered orally or in writing by the Division prior to the publication of any advertisement in response to such an inquiry shall be binding for the purpose of these provisions, except in those instances in which the inquiry has not fully and accurately disclosed the relevant facts regarding the particular job in question.

(d) The Division shall maintain records as to each inquiry made pursuant to the Section, to include the name, title and address of the caller, a summary of the job and job duties, the bases for the exception claimed and the time, date, identification number and disposition of the inquiry.

(e) A newspaper or other publication shall not be in violation of these provisions where it has accepted any specific advertisement in good faith and in reasonable reliance upon the representations of the person placing the advertisement that he has obtained from the Division an opinion that there is a *bona fide* occupational qualification for the specific job advertised together with the identification number of that opinion.

13:11-1.7  Violations

Failure to comply with this Chapter will constitute a violation of N. J. S. A. 10:5-12.

\*        \*        \*        \*        \*        \*        \*        \*

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, PROCTOR, HALL, MOUNTAIN and SULLIVAN and Judge CONFORD—7.

*For reversal*—None.