**RESOLUTION TRUST CORPORATION as Receiver of City Savings, F.S.B., Plaintiff,**

v.

**William J. SPAGNOLI, Beverly Spagnoli a/k/a Beverly Longo, Barry Spagnoli, Joanne Spagnoli, and Annette Spagnoli, Nicholas Spagnoli, William C. Spagnoli, Christopher D. Spagnoli, Paul Longo and Charles Ballister, Defendants.**

**Civ. A. No. 92–400 (MTB).**

United States District Court, D. New Jersey.

Jan. 4, 1993.

Amending Order Feb. 8, 1993.

---

**13.** I do not reach Lebron's alternative contract theory because this resolution makes it superfluous.

Riker, Danzig, Scherer, Hyland & Perretti by Jeffrey J. Miller, Morristown, N.J., for plaintiff Resolution Trust Corp. as Receiver for City Sav., F.S.B.

Louis C. Annunziata, Elizabeth, N.J., for defendants William J. Spagnoli and Beverly Spagnoli.

Robert W., Schwankert, Livingston, N.J., for defendants Paul Longo, Charles Ballister, Nicholas Spagnoli, William C. Spagnoli, Christopher Spagnoli, Barry Spagnoli, Joanne Spagnoli and Annette Spagnoli.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BARRY, District Judge.

### INTRODUCTION

The procedural history of this matter is accurately and comprehensively set forth in the brief of plaintiff Resolution Trust Corporation ("RTC") and will be adopted and herein set forth in full.

"On January 30, 1992, the [RTC] as Receiver of City Savings, F.S.B. filed a Verified Complaint pursuant to 12 U.S.C. §§ 1821(d)(17), (18), and (19), and other applicable law, seeking injunctive relief, the appointment of a trustee, the establishment of a constructive trust, and the avoidance of fraudulent transfers. Named as defendants were William Spagnoli ('Spagnoli'), his wife Beverly Spagnoli, his brother Barry Spagnoli, his sister-in-law Joanne Spagnoli and his mother Annette Spagnoli. The injunctive relief sought by the RTC at the time was directed only to four assets that were transferred by William Spagnoli to the other defendant family members. In addition to the filing of its Verified Complaint, the RTC also sought and obtained the entry of an Order to Show Cause With Temporary Restraints Freezing Certain Assets and Ordering Discovery and An Accounting (the 'Order to Show Cause'). On April 22, 1992, the return date of the Order to Show Cause, the Court entered a preliminary injunction restraining defendants from transferring or disposing of the transferred assets and ordering discovery and an accounting.

"On June 21, 1992, the RTC filed a Verified Amended Complaint directed at additional assets that were transferred by Spagnoli and his wife Beverly to five additional family members—Spagnoli's brother Nicholas Spagnoli, Spagnoli's sons William C. and Christopher, his wife's uncle Charles Ballister and his father-in-law Paul Longo. Again, in addition to the filing of its Verified Amended Complaint, the RTC also sought and obtained an Order to Show Cause with Temporary Restraints Freezing Certain Assets. On October 22, 1992, defendants consented to the entry of a preliminary injunction freezing the additional assets as well.

"Spagnoli is currently serving a seven-year prison sentence as a result of his guilty plea to five counts of a thirty count

indictment brought against him relating to criminal activity he engaged in while employed by City Federal. [The judgment of sentence was affirmed by the Court of Appeals for the Third Circuit by Memorandum Opinion filed October 28, 1992]. During discovery in this civil case, Spagnoli was deposed on June 1, 1992. He invoked the Fifth Amendment and refused to answer any questions. Accordingly, in October 1992, the RTC filed a motion to dismiss Spagnoli's defenses or, in the alternative, for sanctions for his refusal to answer any questions at his deposition. On October 14, 1992, Magistrate[-Judge] Joel A. Pisano heard argument on the RTC's motion and found that sanctions were warranted as [the] result of Spagnoli's blanket invocation of the Fifth Amendment. Specifically, Magistrate[-Judge] Pisano held that: (1) Spagnoli would be precluded from testifying at trial; (2) the RTC would receive the benefit of all negative inferences that could be drawn as [the] result of Spagnoli's invocation of the Fifth Amendment; and (3) Spagnoli should pay the attorney's fees and costs incurred by the RTC in taking his deposition and filing the motion for sanctions. Order dated October 14, 1992.[1] Spagnoli did not appeal from that Order.

"On October 21, 1992, the RTC filed a motion for partial summary judgment on its claims that certain transfers were fraudulent. In particular, summary judgment was sought on the following transfers:

A. By Deed dated December 26, 1989, Spagnoli's interest in 6 Cobblestone Court, Holmdel Township, Monmouth County Lot 203, Block 21 was transferred from Spagnoli to his wife Beverly, for no consideration;

B. On or about August 10, 1990, Spagnoli transferred $84,346.55 in monies he received in bribes and kickbacks to Barry and Joanne Spagnoli, and said sum was used as a down payment for the purchase of the property now owned by Barry and Joanne at 3 Larch Road, Cedar Knolls, New Jersey.

C. On or about August 17, 1990, Spagnoli transferred $30,000 of the monies he received as bribes and kickbacks to Barry Spagnoli in a form of a certified check drawn on his wife's Merrill Lynch account;

D. On or about December 7, 1990, Spagnoli transferred $45,000 of monies he received as bribes and kickbacks to his brother Nicholas Spagnoli in the form of a certified check drawn on his wife's Merrill Lynch account;

E. On or about December 21, 1990, Spagnoli transferred $45,000 of the monies he received as bribes and kickbacks to his son, William C. Spagnoli, in the form of a wire transfer from his wife's Merrill Lynch account to his son's account at the First National Bank of Atlanta, Georgia; and

F. From 1989 through 1991, Spagnoli transferred $30,000 of the monies he received as bribes and kickbacks to his sons, William C. Spagnoli and Christopher D. Spagnoli in the forms of gifts to each child.

"The motion was made returnable on November 12, 1992, the date that this matter was set for trial. On that date, the Court heard argument on the partial summary judgment motion, adopted and incorporated the RTC's statement of facts in its brief, and granted the motion in full. In particular, the Court held that:

[All the subject transfers] were made after William Spagnoli was advised that he was the subject of a criminal investigation, were made to hinder, delay and defraud ... City Federal and [the] RTC successor, and thus were fraudulent [in] that none of them were given for value.

The RTC is permitted, therefore, to avoid these transfers and to recover either the judgment *or a judgment for the value of the property.*

"(Transcript of Proceedings of November 12, 1992, TR. at 6:24–7:6.)

---

1. Magistrate Pisano also vacated the defaults that had been previously entered against William and Beverly Spagnoli.

"After ruling on the summary judgment motion, the Court conducted a bench trial on the remaining issues raised by the Amended Verified Complaint—namely the liability of Spagnoli for fraud and breach of fiduciary duty and the liability of Beverly Spagnoli for aiding and abetting her husband's tortious conduct. In addition, the RTC sought to avoid the following transfers:

A. On or about December 26, 1989, Spagnoli and his wife transferred to Barry Spagnoli, Spagnoli's brother, certain real property located at 14 Seven Oaks Drive, Holmdel Township, Monmouth County, New Jersey, Lot 10, Block 20.2;

B. On or about August 17, 1990, Spagnoli transferred $35,000 of the monies he received as bribes and kickbacks to his brother, Nicholas Spagnoli, in the form of a certified check drawn on his wife's Merrill Lynch account;

C. On or about August 24, 1990, Spagnoli transferred $91,000 of the monies he received as bribes and kickbacks to his mother Annette Spagnoli, in the form of a certified check drawn on his wife's Merrill Lynch account;

D. On or about August 24, 1990, Spagnoli transferred $64,000 of the monies he received as bribes and kickbacks to his father-in-law, Paul Longo, in the form of a certified check drawn on his wife's Merrill Lynch account;

E. On or about August 24, 1990, Spagnoli transferred $30,000 of the monies he received as bribes and kickbacks to his wife's uncle, Charles D. Ballister, in the form of a certified check drawn on his wife's Merrill Lynch account;

"The RTC [with the consent of the defendants] submitted its case through the record created in Spagnoli's criminal proceeding, the deposition testimony of the defendants in this case and documents properly identified in those depositions. The defendants presented Beverly Spagnoli, Barry Spagnoli, Nick Spagnoli, Charles Ballister and Paul Longo as witnesses...."

Based on all that is before the court, the court's Findings of Fact and Conclusions of Law follow. Parenthetically, the bulk of the facts as found by the court are not in dispute and the battle has been waged over who is to be believed and the legal conclusions to be reached depending upon whose version of the few disputed facts is believed. It is crystal clear that RTC has won the battle—and the war.

## FINDINGS OF FACT

1. It is undisputed that on September 16, 1991, William Spagnoli ("Spagnoli") pled guilty to five counts of a thirty-count indictment, those counts charging him with violations of 18 U.S.C. §§ 215(a)(2) and 371 (conspiracy to solicit payment to bank officer) and 26 U.S.C. § 7201 (tax evasion). It is similarly undisputed that at his Rule 11 hearing, Spagnoli admitted (1) that he was employed at City Federal Savings Bank ("City Federal") from approximately 1977 to approximately October 1989; (2) that he agreed with various borrowers of City Federal on one or more occasions that as a reward for helping them in connection with his administration of their loans he would receive payments from them; (3) that he accepted these payments with the intention of being rewarded in connection with his administration of the City Federal loans to the borrowers; and (4) that those payments "clearly exceed[ed] one million dollars." Spagnoli was sentenced on March 10, 1992, the court finding that:

[T]he approval process was corrupt. Spagnoli told the developers what they had to do and how to do it and signed off on the loans which thereafter went to the loan committees for approval. He was the gate keeper through whose gate one had to pass. It defies any concept of commercial reality to argue that with the approval or the disapproval of the bank officer who was at all times, first, in charge of City Federal's residential development loans in the State of New Jersey, then responsible for all residential development loans in the Northeast United States, and ultimately in charge of virtually all residential development loans in the United States, that the loan committees, whose meetings Spagnoli attended, would thereafter put a microscope to those loans, and there is no

member of any committee who says that they did. *Indeed, it appears that at least two of the developers would have testified that Spagnoli told them that he would block their loans if they did not pay the kickbacks he commanded.*

\* \* \* \* \* \*

The developers are not bathed in glory. While unhappy to pay kickbacks, they paid and got the loans they wanted, just as Spagnoli got the cash and other things of value he wanted and of course, *Spagnoli saw to it that the loan proceeds were inflated to cover his insatiable demands and the collateral as a result was diminished.*

(P3, Tr. 4:02–19, 5:18–20) (emphasis added). Based, in part, upon those findings, the Court upward departed, sentencing Spagnoli *to imprisonment for a term of seven years and a three-year term of supervised release.* The Court also ordered Spagnoli to make restitution to the RTC in the amount of $2,540,717.00, the amount of the kickbacks he had received. The sentence was affirmed in all respects by the Court of Appeals.

2. It is undisputed that the monies illegally received by Spagnoli were eventually deposited into accounts maintained by Spagnoli with Merrill Lynch, and that it was from those accounts that all but one of the transfers in question occurred. The sole remaining transfer, again undisputed, was from the Spagnolis' bank account under the name of LASKO, and the court finds that $500,000 in bribe monies was laundered through that account. When asked during his deposition about the source of the funds in the Merrill Lynch accounts, Spagnoli invoked the Fifth Amendment and refused to answer any question.

Viewing the evidence in its entirety and drawing the negative inference from Spagnoli's invocation of the Fifth Amendment, the source of monies in the Merrill Lynch and LASKO accounts were bribes paid to Spagnoli by City Federal borrowers.

3. Beverly Spagnoli was an active participant in Spagnoli's kickback scheme. She signed checks maintained in the LAS-KO account for $100,000 and $150,000 to one of the City Federal borrowers as part of a reverse kickback scheme. (P7; P8, Tr. 29:23–31:20). It is undisputed that she also signed checks for $165,800, $65,500, $50,000, $60,000 and $54,800 to the same borrower out of her joint account; that she received checks from borrowers made payable to her using her maiden name; that, in her maiden name, she was deeded various properties by various borrowers of City Federal; and that she used her parents' address on some of the deeds. Mrs. Spagnoli was also involved in laundering the bribe monies by cashing numerous checks in amounts just under the $10,000 reporting limit. (P16, Tr. 171:10–15, P5, Tr. 54:13–57:17, 45:9–49:04, 62:10–12).

Mrs. Spagnoli's testimony was not credible. She testified that she commenced the use of her maiden name in order to avoid being bothered by tenants of the Spagnolis' rental properties. (Trial Tr. 42:2–45:20). However, she admitted that she used her maiden name at other times for other purposes but was unable to provide an explanation as to why it was used. (Trial Tr. 45:12–16). She also admitted receiving checks in large amounts in her maiden name from borrowers of City Federal (Trial Tr. 63:18–64:9) and admitted writing checks for large amounts to borrowers of City Federal, some of which she signed in her maiden name. (Trial Tr. 65:3–14; 66:8–68:4). She testified that when she received and signed those checks she was acting "mechanically" and only did what her husband asked her to do. (Trial Tr. 50:19–51:21). Despite her transfer of hundreds of thousands of dollars, Mrs. Spagnoli testified that she had no suspicions or inkling about what the checks were for. (Trial Tr. 65:18–21; 68:2–4). Indeed, Mrs. Spagnoli was unable to maintain a consistent explanation for the receipt and delivery of these large sums of money. At one point she testified that she believed these monies were given to her husband by borrowers of City Federal out of "friendship". (Trial Tr. 61:2–63:17). Later, she testified that they were given to her husband as part of a

business arrangement. (Trial Tr. 70:2–8). Her testimony was not available.

4. It is undisputed that at the end of October 1989, Spagnoli was suspended from City Federal while an investigation was conducted into the improprieties involved in loans managed by Spagnoli. On December 4, 1989, Spagnoli's employment was terminated retroactive to October. Aware of the investigation being conducted, Spagnoli retained criminal counsel in November 1989. On December 26, 1989, Spagnoli transferred his interest in his home at 6 Cobblestone Court to his wife, a transfer already determined by the court to have been fraudulent and, on the same day, the Spagnolis transferred their interest in a home at 14 Seven Oaks Drive, Holmdel, New Jersey, to Spagnoli's brother, Barry. It is similarly undisputed that the 14 Seven Oaks Drive home had been purchased in September 1988 by William and Barry Spagnoli for $480,000. William Spagnoli contributed $350,000 of that amount and although Barry Spagnoli contributed $130,000 (Trial Tr. 86:08–10), the deed to the property was in William and Beverly Spagnoli's names. There is no document evidencing the rights and obligations of the purported partnership between William and Barry Spagnoli (Trial Tr. 87:02–04).

The consideration for the December 26, 1989 transfer of 14 Seven Oaks was listed in the deed as $96,000, although no money changed hands. In addition, Spagnoli took back a mortgage on the property in the amount of $384,000 payable on 30–days demand. (P. 30) Accordingly, the house was valued by Spagnoli and his brother as being worth $480,000 ($384,000 plus $96,000) and the parties to that transaction recognized Barry Spagnoli's interest in the property as 20% ($96,000/$480,000). It is undisputed that Spagnoli invoked the Fifth Amendment when asked the reason for the transfer of the house to his brother. Barry Spagnoli testified at his deposition that the transfer occurred "[b]ecause [Spagnoli] was under a lawsuit and to protect my interest...." (P. 31, Tr. 60:25–62:04).

Viewing all the evidence and drawing the negative inference from Spagnoli's invoca-tion of the Fifth Amendment, the transfer of 14 Seven Oaks Drive on December 26, 1989 was made to hinder, delay and defraud the RTC and was not made in good faith by Spagnoli, Beverly Spagnoli or Barry Spagnoli.

5. It is undisputed that also in December, 1989, Spagnoli transferred all of the funds in his and his wife's joint Merrill Lynch account to an account established in his wife's name alone. He subsequently established Merrill Lynch accounts in his sons' names. It is similarly undisputed that when asked about these transfers, Spagnoli invoked the Fifth Amendment.

Viewing all the evidence and drawing the negative inference from Spagnoli's invocation of the Fifth Amendment, the transfer of funds from William and Beverly Spagnoli's joint Merrill Lynch account to individual accounts for Beverly, William C. and Christopher D. Spagnoli, were made with the intent to hinder, delay and defraud the RTC and were without valid consideration. Beverly Spagnoli was aware of this intent at the time of the transfers.

6. On August 1, 1990, the Spagnolis and their sons were visited by two FBI agents who informed Spagnoli that he was the subject of a bank bribery investigation. (P. 20, Tr. 27:18–28:16). It is undisputed that during that visit, Spagnoli was informed that he had been videotaped by the FBI during a conversation with two of the City Federal borrowers involved in the kickback scheme. Shortly afterwards, Spagnoli and his wife began to transfer large sums of money to their family members.

A. On August 17, 1990, Beverly Spagnoli obtained a certified check from her Merrill Lynch account for $30,000 and endorsed it and transferred it to Barry Spagnoli. (*See* P. 39, P40, Tr. 66:24–69:12). At the time of the transfer, Barry Spagnoli knew that his brother (1) was under investigation; (2) had been unemployed for over ten months and (3) had just loaned him $84,365.35. Prior to Spagnoli's loan of $84,365, Barry never borrowed from Spagnoli more than $2,000 at any time. (*See* P. 36, Tr. 44:20–46:08; Tr. at 97:16–19.) He accepted, however, the $30,000 from his

brother without asking any questions. (Trial Tr. 95:18–20). The $84,365.00 transfer has previously been determined by this court to have been a fraudulent transfer.

Barry Spagnoli testified that the $30,000 was a buy-out of part of his interest in 14 Seven Oaks. (Trial Tr. at 87:24–88:03). There is no evidence, however, to support that statement and Barry Spagnoli's testimony on that issue was not credible. The transfer of 14 Seven Oaks to Barry had occurred 9 months earlier at which time Barry acquired all of the interest in the property (although fraudulently). If any monies were to be exchanged as part of that transaction it should have been Barry paying off the $384,000 mortgage, not Spagnoli paying additional sums to Barry. Given the circumstances and timing of this transfer, it is clear that Spagnoli and his wife were attempting to divert funds from their creditors. When asked about the $30,000 transfer, it is undisputed that Spagnoli asserted the Fifth Amendment and refused to answer any questions.

Viewing all the evidence and drawing the negative inference from Spagnoli's invocation of the Fifth Amendment, the $30,000 transfer was made with the intent to hinder, delay and defraud the RTC and without proper consideration. Spagnoli, Beverly Spagnoli and Barry Spagnoli were all aware of this at the time of the transfer.

B. It is undisputed that on August 17, 1990, Beverly Spagnoli obtained another certified check from her Merrill Lynch account for $35,000, endorsed it and gave it to Spagnoli's older brother, Nick Spagnoli. Again, Beverly Spagnoli acted on her husband's instructions. (*See* P. 43, Tr. 70:22–71:19). It is similarly undisputed that Nick Spagnoli, at the time of the transfer, knew that (1) his brother was under investigation and (2) had been unemployed for over ten months.

Nick Spagnoli's testimony as he attempted to explain this transfer was simply not credible. He testified that in July, 1990 he advanced his brother $35,000 so that they could go into the real estate business together (Trial Tr. 99:21–100:15). However, after only one month, "it didn't look like it would make too much sense to go forward with it ... The real estate market looked like it was not really good at that point in time." (Trial Tr. 101:1–5). Accordingly, Nick testified that his brother transferred the $35,000 back to him. While the real estate market may, indeed, have taken a turn for the worse, the clear motivation for the transfer was the visit by the F.B.I. on August 1, 1990, motivation evidenced by the proximity of this transfer to that visit as well as to the other transfers Spagnoli made to family members. Moreover, Nick testified that he gave the real estate business—Beverly Hills Realty—the $35,000 check. (Trial Tr. 104:5–11). However, the check returned to him was not a return of the funds in the business but rather a transfer of the bribe monies maintained in the Merrill Lynch account by way of a personal check from Beverly Spagnoli.[2] Spagnoli, it is undisputed, invoked the Fifth Amendment when asked about the transfer of the $35,000 to Nick Spagnoli.

The evidence and the negative inference from Spagnoli's invocation of the Fifth Amendment, mandate the conclusion that the $35,000 transfer was made with the intent to hinder, delay and defraud the RTC and was made without proper consideration. Spagnoli, Beverly Spagnoli and Nick Spagnoli were aware of this at the time of the transfer.

C. On August 24, 1990, Beverly Spagnoli obtained a certified check from her Merrill Lynch account for $91,000, endorsed it and gave it to her mother-in-law, Annette Spagnoli. (P. 46; P. 47; Tr. 73:13–75:08). Again, Beverly Spagnoli acted at her husband's direction and admitted that only Spagnoli fully understands why Annette Spagnoli was given $91,000 (*See* P. 47, Tr. 74:25–75:06). Indeed, at trial she

**2.** Nick Spagnoli failed to reveal in his certification, which supposedly set forth all transfers between he and his brother, that he funnelled $22,500 of the $35,000 back to his brother in March, 1992 by "loaning" him money for his criminal appeal. (DBS3; DBS4). Parenthetically, this $22,500 "loan" is inaccurately noted in the trial transcript as being $2,500; DBS–3 and DBS–4 leave no doubt that the correct amount is $22,500.

could only make an "assumption" as to how Spagnoli arrived at the $91,000 figure. (Trial Tr. 80:19–21). Spagnoli invoked his Fifth Amendment privilege and, it is undisputed, refused to answer any questions concerning the transfer.

Annette Spagnoli did not testify at trial. However, during her deposition, she admitted that: (1) she knew her son was unemployed for almost a year; (2) her son told her that he was giving her the money to take care of her "because he didn't know what was going to happen to him"; (3) she never asked her son "what might happen to him" or how he could afford to give her $91,000; and (4) there were no written documents evidencing any debt that the sum was in repayment for. (*See* P48, Tr. 07:09–08:23).

In light of the evidence and the negative inference drawn from Spagnoli's invocation of the Fifth Amendment, the transfer of $91,000 was made with the intent to hinder, delay or defraud the RTC and was without proper consideration. Moreover, at least Spagnoli and Beverly Spagnoli did not act in good faith regarding this transfer.

D. Also on August 24, 1990, Beverly Spagnoli obtained a certified check from her Merrill Lynch account for $64,000, endorsed it, and gave it to her father, Paul Longo, because, she testified, her father told Spagnoli that he needed the money. (P. 50; P. 51; Tr. 77:06–79:16). While claiming that he was given the money because he was purchasing a home. Longo admitted that (1) he only bought his home a year later on August 1991; (2) he did not draw down on any of the proceeds until February 1992, one month after the complaint in this action was filed; and (3) he has returned $25,000 of the $64,000 to Beverly Spagnoli since March 1992. Longo also admitted that the FBI interviewed him in November 1990. (p. 52; Tr. 12:07–15, 18:09–21:05).

There are no written documents evidencing any debt the Spagnolis owed Longo. Longo testified, however, that his transfer was in repayment for "loans" made over the years to Spagnoli and his wife. However, he admitted that he had "no idea" how much he had loaned to them. (Trial Tr. 122:14–16). He also testified that Spagnoli and his wife had never before repaid any of the money and that Longo did not ask to be repaid in August, 1990. (Trial Tr. 123:21–124:18). Longo, a caring father, gave his daughter money any time she asked for it (Trial Tr. 126:21) and he expected that if he asked her for money she would give it to him. (Trial Tr. 127:10–13). It is clear, and the court finds, that Longo, an elderly man and an obviously decent man, while now believing that the money he had given his daughter from the time she was a student was a "loan", has been manipulated by his daughter and son-in-law into so believing. Spagnoli again invoked his Fifth Amendment privilege and refused to answer questions relating to the transfer.

Viewing all the evidence and drawing the negative inference from Spagnoli's invocation of the Fifth Amendment, the transfer of $64,000 to Paul Longo was intended to hinder, delay and defraud the RTC. Moreover, the transfer was not for value, as it was not repayment for a legal antecedent debt, and Spagnoli and his wife did not transfer the funds in good faith.

E. Also on August 24, 1990, Beverly Spagnoli obtained yet another certified check from her Merrill Lynch account for $30,000, endorsed it and provided it to her uncle, Charles Ballister. (P. 54) Again, Beverly Spagnoli admitted that she acted on her husband's instructions and that he is the only one who possesses sufficient knowledge to fully explain the transfer. (*See* P. 55, Tr. 54:07–55:09) Spagnoli, of course, invoked his Fifth Amendment privilege and refused to answer any questions.

Ballister conceded that (1) there are no written documents evidencing any debt between the Spagnolis and himself and (2) since February 1992, he has "reloaned" back to Beverly Spagnoli $20,000 of the $30,000 transferred to him. (P. 56, Tr. 10:13–12:17, 33:21–34:08). He admitted, moreover, that he was surprised when he was given the $30,000 check and asked "what's this for?", (Trial Tr. 110:15–25), given that he did not think that he had

loaned Spagnoli and his wife that much money. (Trial Tr. 111:1–4) Indeed, Ballister testified that he did not know the amount of money he loaned Spagnoli and his wife over the years. (Trial Tr. 111:3–4). Much like Paul Longo, Ballister's understanding concerning the repayment of any loans was that Spagnoli and his wife were not obligated to make repayment but that if they wanted to repay him when they had the funds he would accept it. (Trial Tr. 108:16–20). Again, like Paul Longo, Ballister was manipulated by the Spagnolis.

Viewing all the evidence and drawing the negative inference from Spagnoli's invocation of the Fifth Amendment, this transfer was also designed to hinder, delay or defraud the RTC and was not given for value. Moreover, William and Beverly Spagnoli did not act in good faith in transferring these funds to Charles Ballister.

## CONCLUSIONS OF LAW

A. THE RTC IS ENTITLED TO A JUDGMENT FOR FRAUD AND BREACH OF FIDUCIARY DUTY AGAINST SPAGNOLI

■ 1. The acts to which Spagnoli pled guilty also render him liable to the RTC for fraud and breach of fiduciary duty, and Spagnoli is collaterally estopped from attempting to relitigate those issues. *See Teachers Ins. and Annuity Ass'n v. Green*, 636 F.Supp. 415 (S.D.N.Y.1986).

2. The elements of fraud in New Jersey are "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge of the falsity by the person making the misrepresentation; (3) intent that the misrepresentation be relied upon; and (4) reliance on the misrepresentation." *B.F. Hirsch v. Enright Ref. Co., Inc.*, 751 F.2d 628, 631 (3d Cir.1984). Where a fiduciary relationship exists, that relationship calls for "perfect good faith and full disclosure" by the fiduciary; the fiduciary's mere silence, in the face of such a duty to disclose, is fraudulent concealment under New Jersey law. *Berman v. Gurwicz*, 189 N.J.Super. 89, 93–94, 458 A.2d 1311 (Ch.Div.1981), *aff'd* 189 N.J.Super. 49, 458 A.2d 1289 (App.Div.1983), *cert. denied* 94 N.J. 549, 468 A.2d 197 (1983).

■ 3. Spagnoli owed City Federal a fiduciary duty and breached that duty when he engaged in his bribery scheme. As the Third Circuit stated in *United States v. Badaracco*, 954 F.2d 928, 938 (3d Cir.1992), "[w]hen the officer of a financial institution uses his or her position for personal benefit, there is a breach of fiduciary duty comparable to that implicated by embezzlement...." Here, Spagnoli has admitted to accepting money and other benefits from City Federal borrowers and performing acts of assistance for these borrowers for which he intended to be rewarded by the payments he received from them. Those acts are clearly in breach of his fiduciary duty entitling the RTC, as the successor of City Federal, to a judgment for breach of fiduciary duty.

■ 4. It is equally clear that Spagnoli defrauded City Federal out of, at the very least, the $2.5 million in kickbacks he received from the City Federal borrowers. As an officer of City Federal, he had a fiduciary duty to City Federal that required the utmost fidelity and absolute good faith in his dealings with City Federal. That duty also required him to disclose all of his dealings with borrowers of City Federal. He failed to comply with that duty. As this court found in sentencing Spagnoli:

[T]he approval process was corrupt.... It defies any concept of commercial reality to argue that with the approval or disapproval of the bank officer who was at all times [ ] in charge of City Federal's residential development loans in the State of New Jersey ... that the loan committees, whose meetings Spagnoli attended, would thereafter put a microscope to those loans, and there is no member of any committee who says that they did. Indeed, it appears that at least two developers would have testified that Spagnoli told them that he would block their loans if they did not pay the kickbacks he demanded. (P. 3, Tr. 4:2–19)

■ 5. The damages City Federal suffered are at the very least the amount of kickbacks paid to Spagnoli. Again, as this

court found at sentencing, "Spagnoli saw to it that the loan proceeds were inflated to cover his insatiable demands and the collateral as a result was diminished." (P. 3, Tr. 5:18–20). Thus, City Federal was financing the kickbacks to Spagnoli. To the extent that loan proceeds were diverted to Spagnoli, they could not go into the projects for which they were intended. Thus, the value of the collateral did not represent the full value of the funds that had been disbursed.

6. Additionally, the kickbacks the developers paid to Spagnoli represent a loss to City Federal in the form of usurped opportunity. As an officer of City Federal, Spagnoli had an obligation to negotiate payment of fees solely for City Federal's benefit and not his own. By accepting these kickbacks, Spagnoli defrauded City Federal out of the opportunity to earn additional fees from borrowers. Moreover, federal regulations applicable to savings associations specifically preclude officers from earning fees in connection with loans that savings associations grant. 12 CFR § 563.-40(a), which was in effect at the time Spagnoli accepted his kickbacks, states that:

> "[n]o affiliated person of a savings association may receive, directly or indirectly, from such association, any subsidiary thereof, or any other source any fee or other compensation of any kind in connection with the procurement of any loan from such association or subsidiary thereof."

7. Accordingly, a judgment against Spagnoli as a result of his fraud and breach of fiduciary duty will be entered on the First and Second Counts of the Amended Complaint in the amount of $2,540,-717.00, which is the amount of kickbacks this court has previously determined Spagnoli received and the Court of Appeals, in affirming the amount of restitution ordered, found was "well documented" in the Presentence Report. Memo Op. at 12.

**B. THE RTC IS ENTITLED TO A JUDGMENT AGAINST BEVERLY SPAGNOLI FOR AIDING AND ABETTING HER HUSBAND'S TORTIOUS ACTIVITIES**

 8. Under New Jersey and federal common law, Beverly Spagnoli is liable for her part in aiding, abetting and assisting Spagnoli in his tortious conduct. "A person is liable with another if he 'knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.'" *Judson v. Peoples Bank & Trust Co.*, 25 N.J. 17, 29, 134 A.2d 761 (1957) (citing 4 *Restatement, Torts* (1939), sec. 876(b)).

9. Mrs. Spagnoli was not only aware of Spagnoli's tortious conduct but knew that she was aiding and abetting that conduct, and her testimony to the contrary was not credible. *First*, borrowers of City Federal gave her husband large sums of money ($20,000; $300,000; $150,000; and $100,-000) but made the checks payable to her. She had no explanation for that course of conduct even though she was aware of the checks because she endorsed them. (P. 11; P. 12; Tr. 42:20–45:12). *Second*, Mrs. Spagnoli wrote checks in large amounts to borrowers of City Federal. Again, she had no good explanation for those checks. *Third*, borrowers of City Federal deeded properties to her and her husband, but the deeds were placed in her maiden name and, at times, the address of her father was used. Mrs. Spagnoli admitted that she was aware of those facts and, unsuccessfully and incredibly, testified that she did not want tenants to bother her at home. Additionally, Mrs. Spagnoli, over a number of years, made numerous deposits and transfers of funds all just under the $10,000 reporting limit, laundering those funds. Finally, she was engaged in transferring the assets in question in this case to various family members—transfers this court has already determined to be fraudulent.

10. Accordingly, based upon the foregoing, judgment will be entered on the Seventh Count of the Amended Complaint in the amount of $2,540,717.00 against Beverly Spagnoli for her role as an aider and abettor of Spagnoli's tortious conduct.

**C. THE TRANSFER OF ASSETS TO THE VARIOUS SPAGNOLI FAMILY MEMBERS SHOULD BE AVOIDED.**

 11. Paragraphs 18 and 19 of 12 U.S.C. § 1821(d) enable the RTC as receiv-

er of a failed thrift to avoid all fraudulent transfers by any party affiliated with the thrift or whom the receiver determines to be a debtor of the failed thrift within five years of the RTC's appointment, and to recover the subject property or a judgment for the value of the property from any immediate or mediate transferee other than transferees in good faith and for value. 12 U.S.C. § 1821(d)(17) reads as follows:

(17) Fraudulent transfers—

(A) In general

The Corporation, as conservator or receiver for any insured depository institution, and any conservator appointed by the ... Director of the Office of Thrift Supervision may avoid a transfer of any interest of an institution-affiliated party, or any person who the, ... conservator determines is a debtor of the institution, in property, or any obligation incurred by such party or person, that was made within 5 years of the date on which the ... conservator was appointed conservator or receiver if such party or person voluntarily or involuntarily made such transfer or incurred such liability with the intent to hinder, delay or defraud the insured depository institution, the Corporation or other conservator, or any other appropriate Federal banking agency.

(B) Right of Recovery

To the extent a transfer is avoided under subparagraph (A), the Corporation or any conservator described in such subparagraph may recover, for the benefit of the insured depository institution, the property transferred, or, if a court so orders, the value of such property (at the time of such transfer) from—

(i) the initial transferee of such transfer or the institution-affiliated party or person for whose benefit such transfer was made; or

(ii) any immediate or mediate transferee of any such initial transferee.

(C) Rights of transferor obligee

The Corporation or any conservator described in subparagraph (A) may not recover under subparagraph (B) from—

(i) any transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith; or

(ii) any immediate or mediate good faith transferee of such transferee.

12. All of the transfers, including those that were the subject of the RTC's successful motion for partial summary judgment, have three common indicia of fraud. *See Resolution Trust Corporation v. Cruce,* 972 F.2d 1195, 1202 (10th Cir.1992). *First,* they all occurred after Spagnoli was terminated from City Federal as a result of his bank bribery scheme and after the time he became aware that his scam had been uncovered. Moreover, the transfers took place in groups, and many on the same day: two transfers on December 26, 1989 after his termination, five transfers in August, 1990 (August 10, 17 and three on August 24) after the FBI visit in which Spagnoli was informed that he had been videotaped, and two transfers of $45,000 each in December 1990. The timing of those transfers in and of itself is sufficient to warrant a finding that the transfers were made with the intent to "hinder, delay or defraud" the RTC. *Second,* all of the transfers were to close family members and none to independent creditors. Transfers to close family members are closely scrutinized and are an additional indicia of fraud. *Cruce,* 972 F.2d at 1202. *Third,* much of the money transferred to the family members has been funnelled back to the Spagnolis in what have been termed "loans" from these very same family members. In effect, Spagnoli has used his family to "cleanse" the bribe monies he received and to attempt to put those monies beyond the reach of the RTC.

13. In addition to these indicia of fraud, a negative inference can and will be drawn as to Spagnoli's intent for each transfer as a result of his invocation of the Fifth Amendment each time he was asked what his intent was in making these transfers.

14. Finally, as to a number of the transfers, the defendants have admitted that

Spagnoli told them he was transferring the properties to them in order to avoid his creditors.

15. Accordingly, it is concluded that these transfers were designed to "hinder, delay or defraud" the RTC.

16. The transfers having been made to hinder, delay or defraud the RTC, 12 U.S.C. § 1821(d)(17) permits the RTC to avoid such transfers and to recover the property transferred or the value of such property from any transferee, except "any transferee that takes for value, ..., in good faith." 12 U.S.C. § 1821(d)(17)(C)(i).[3] Accordingly, in order to defeat the RTC's ability to avoid these transfers, defendants must demonstrate both that they gave "value" and that the transfers were in good faith.

■ 17. In the context of a fraudulent conveyance action, it is the transferee's burden to prove that value was given for the transfer. *See Johnson v. Lentini*, 66 N.J.Super. 398, 405, 169 A.2d 208 (Ch. Div.1961). The defendants attempted to meet this burden by attempting to demonstrate that the transfers were repayments of "loans" made over the years. The "loans" made by Annette Spagnoli, Paul Longo and Charles Ballister were for the most part decades old and covered such items as insurance payments, college tuition and other items of support usually given by close relatives to young family members. There are no documents evidencing these "loans" and the family members cannot specify the amount of these "loans." Even if true loans they be, they are not the type of legally enforceable obligations that qualify as an antecedent debt for fraudulent conveyance purposes. *See In re Fleet*, 89 B.R. 420, 426 (E.D.Pa.1988).

18. Spagnoli also allegedly "repaid" his brother Nick $35,000 in August 1990. Nick testified that he gave Beverly Hills Realty, the Spagnolis' real estate business, $30,000 one month earlier and that this transfer was in repayment of that "loan" plus others. However, Nick Spagnoli could not explain why a loan to the business was

repaid from a personal checking account or why Beverly Hills Realty needed a loan when William and Beverly Spagnoli had ample cash at that time (one week later Spagnoli transferred $185,000 in cash to other family members). Nor could Nick Spagnoli prove the existence of the other loans to make up the $35,000 transferred to him.

19. Likewise, the repayment of $30,000 to Barry Spagnoli was not for value because Barry owed Spagnoli $384,000— Spagnoli owed Barry nothing.

20. Accordingly, it is concluded that these transfers were not given for value as they did not repay legally enforceable antecedent debts.

21. The defendants must also demonstrate their "good faith" in receiving these assets. The family members all knew Spagnoli had been terminated from his employment when they received the transfers and the testimony that the transfers were for value was not credible. Additionally, the family members have since funnelled some of these funds back to Spagnoli. Defendants have not demonstrated that they acted in good faith.

22. Accordingly, a judgment against the Spagnoli relatives will be entered on the Eighth and Ninth Counts of the Verified Amended Complaint as follows:

(A) The $30,000 transfer to Barry Spagnoli on August 10, 1990 is avoided and Barry Spagnoli shall transfer $30,000 to the RTC and prejudgment interest thereon from August 10, 1990 within 60 days hereof;

(B) The transfer of 14 Seven Oaks to Barry Spagnoli by William and Beverly Spagnoli on December 26, 1990 is avoided and Barry Spagnoli's interest in said property shall be limited to the fraction of the stated consideration of the December 26, 1990 deed against the total price of the property which is $96,000 over $480,000 or 20%;

---

**3.** Under New Jersey law, once the Court finds that the transfers were made with "actual intent to hinder, delay or defraud any creditor of the debtor" the transfers can be set aside and the Court need not investigate whether value was given. *N.J.S.A.* 25:2–25(a).

(C) William and Beverly Spagnoli shall transfer the remaining 80% interest in 14 Seven Oaks to the RTC within 60 days hereof;

(D) All rental income obtained by Barry Spagnoli relating to 14 Seven Oaks shall be snared by the RTC and Barry Spagnoli in the above-mentioned percentages; however, Barry Spagnoli shall have no right to any rents or profits on 14 Seven Oaks until he has satisfied the $84,365 judgment entered against him as a result of the summary judgment motion and $30,000 judgment entered against him herein;

(E) The $91,000 transfer to Annette Spagnoli on August 24, 1990 is avoided and Annette Spagnoli shall transfer $91,-000 and prejudgment interest thereon from August 24, 1990 to the RTC within 60 days hereof;

(F) The $64,000 transfer to Paul Longo on August 24, 1990 is avoided and Paul Longo will transfer to the RTC $64,000 and prejudgment interest thereon from August 24, 1990 within 60 days hereof;

(G) The $30,000 transfer to Charles Ballister is avoided and Charles Ballister shall transfer to the RTC $30,000 and prejudgment interest thereon from the date of the transfer within 60 days hereof; and

(H) To the extent that any defendant herein cannot satisfy his/her obligations relating to the transfer of funds, a money judgment for the deficiency shall be entered against him or her.

Counsel for the RTC is to submit an order reflecting these Findings of Fact and Conclusions of Law within ten days of this date.

## ORDER

Robert W. Schwankert, Esquire, counsel for all defendants except for William and Beverly Spagnoli, has moved to vacate that portion of the Order of Judgment dated January 14, 1993 found at paragraph H on the ground that the direction contained therein was not included in the court's Findings of Fact and Conclusions of Law and, thus, that the Order of Judgment may have been signed in error; and

The court finding that the only error was in not setting forth the direction contained in paragraph H of the Order of Judgment as paragraph H of Conclusion of Law # 22 at p. 29 of the Findings of Fact and Conclusions of Law, and the Findings of Fact and Conclusions of Law are hereby amended accordingly;

It is on this 5th day of February, 1993

ORDERED that the motion to vacate paragraph H of the Order of Judgment dated January 14, 1993 be and hereby is denied.[1]

## ORDER OF JUDGMENT

This matter having come on for trial before the Court sitting without a jury on November 12, 1992; and the Court having heard the witnesses and reviewed the evidence presented; and the Court further having filed its written Findings of Fact and Conclusions of Law on January 4, 1993; and for good cause shown,

IT IS on this 14th day of January, 1993.

ORDERED that Judgment be, and the same hereby is, entered in favor of the Resolution Trust Corporation as Receiver of City Savings, F.S.B. and against William J. Spagnoli on the First and Second Counts of the Amended Complaint in the amount of $2,540,717.00;

IT IS FURTHER ORDERED that Judgment be, and the same hereby is, entered in favor of the Resolution Trust Corporation as Receiver of City Savings, F.S.B. and against Beverly Spagnoli on the Seventh Count of the Amended Complaint in the amount of $2,540,717.00;

IT IS FURTHER ORDERED that Judgment be, and the same hereby is, entered in favor of the Resolution Trust Corporation as Receiver of City Savings, F.S.B. and against the defendants on the Eighth and Ninth Counts of the Amended Complaint as follows:

---

1. Given this disposition, the motion to stay the Judgment insofar as it pertains to paragraph H until the motion to vacate is heard is denied as moot.

(A) The $30,000 transfer to Barry Spagnoli on August 10, 1990 is avoided and Barry Spagnoli shall transfer $30,000 to the Resolution Trust Corporation as Receiver of City Savings, F.S.B. with prejudgment interest thereon at 7.70% from August 10, 1990 to the date of the entry of this Judgment;

(B) The transfer of 14 Seven Oaks to Barry Spagnoli by William and Beverly Spagnoli on December 26, 1989 is avoided and Barry Spagnoli's interest in said property shall be, and hereby is, limited to the fraction of the stated consideration of the December 26, 1989 deed against the total price of the property, which is $96,000 over $480,000 or 20%;

(C) William and Beverly Spagnoli shall transfer by deed the remaining 80% interest in 14 Seven Oaks to the Resolution Trust Corporation as Receiver of City Savings, F.S.B.;

(D) All rental income previously obtained or obtained in the future by Barry Spagnoli relating to 14 Seven Oaks shall be shared by the Resolution Trust Corporation as Receiver of City Savings, F.S.B. and Barry Spagnoli in the percentage of 80/20 respectively; however, Barry Spagnoli shall have no right to any rents or profits from 14 Seven Oaks until he has satisfied the $84,365 judgment previosly entered against him as a result of the RTC's summary judgment motion and the $30,000 judgment entered against him herein;

(E) The $91,000 transfer to Annette Spagnoli on August 24, 1990 is avoided and Annette Spagnoli shall transfer to the Resolution Trust Corporation as Receiver of City Savings, F.S.B. $91,000 with prejudgment interest thereon at 7.93% from August 24, 1990 to the date of the entry of this Judgment;

(F) The $64,000 transfer to Paul Longo on August 24, 1990 is avoided and Paul Longo shall transfer to the Resolution Trust Corporation as Receiver of City Savings, F.S.B. $64,000 with prejudgment interest thereon at 7.93% from August 24, 1990 to the date of entry of this Judgment;

(G) The $30,000 transfer to Charles Ballister on August 24, 1990 is avoided and Charles Ballister shall transfer to the Resolution Trust Corporation as Receiver of City Savings, F.S.B. $30,000 with prejudgment interest thereon at 7.93% from August 24, 1990 to the date of entry of this Judgment;

(H) The transfers by William J. Spagnoli of all of the funds in his and his wife's joint Merrill Lynch account to individual accounts for Beverly, William C. and Christopher D. Spagnoli are avoided and the funds in those accounts shall be transferred to the Resolution Trust Corporation as Receiver of City Savings, F.S.B. To the extent those funds are frozen by a prior Order of this Court, that Order is lifted solely to permit the Resolution Trust Corporation as Receiver of City Savings, F.S.B. to recover the funds in the Merrill Lynch accounts; and

(I) To the extent any defendant fails to satisfy the terms of this Judgment within 60 days from the entry of this Judgment, then a money judgment for the deficiency shall be entered against him or her upon application to the Court by the Resolution Trust Corporation as Receiver of City Savings, F.S.B.