

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-29-1998

# Failla v. City of Passaic

Precedential or Non-Precedential:

Docket 96-5538

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Failla v. City of Passaic" (1998). *1998 Decisions*. Paper 125.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/125

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 29, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 96-5538, 96-5539 and 96-5835

WILLIAM FAILLA

v.

CITY OF PASSAIC;
PASSAIC POLICE DEPARTMENT;
VICTOR JACALONE, Chief of Police

Victor Jacalone, in his official capacity and individually
Appellant in No. 96-5538

City of Passaic and Passaic Police Department
Appellants in No. 96-5539

Victor Jacalone,
Appellant in No. 96-5835

On Appeal from the United States District Court
for the District of New Jersey

(D.C. No. 93-1957)

Argued January 27, 1998

BEFORE: SCIRICA, ROTH, and RENDELL
Circuit Judges

(Filed: May 29, 1998)

Allan Roth, Esq. (argued)
Scarinci & Hollenbeck
500 Plaza Drive, Box 3189
Seacaucus, N.J. 07096
Counsel for Appellants
City of Passaic and Passaic Police
Department

Peter W. Till, Esq. (argued)
Wilf & Silverman
820 Morris Turnpike, Suite 201
Short Hills, N.J. 07078
Counsel for Appellant
Victor Jacalone

Michael Shen, Esq.
Shneyer & Shen, P.C.
1085 Teaneck Road
Teaneck, N.J. 07666
Counsel for Appellee William Failla

Jeffrey E. Fogel, Esq. (argued)
Ball Livingston
661 Franklin Avenue
Nutley, N.J. 07110
Counsel for Appellee William Failla

OPINION OF THE COURT

RENDELL, Circuit Judge.

Appellants City of Passaic, Passaic Police Department, and Victor Jacalone appeal from a judgment entered upon a jury's determination that appellants violated the New Jersey Law Against Discrimination when they transferred appellee William Failla to a night shift which aggravated his back condition, and from the district court's orders denying their consolidated post-trial motions and their motion for reconsideration of the award of attorneys' fees to Failla. For the reasons set forth below, we will affirm the judgment entered against the City and the Police Department, vacate the judgment entered against Jacalone, and reverse the district court's order denying appellants' post-trial motions

2

insofar as it imposes individual liability on Jacalone, but will affirm the order in all other respects. We will also affirm the order denying appellants' motion for reconsideration of the attorneys' fee award.

I.

Failla served as a captain with the Passaic Police Department. In 1989, he suffered a work-related back injury for which he subsequently received a partial disability award pursuant to the Worker's Compensation Act. In 1991, Failla was transferred from day shift to night shift work. At trial, Failla testified that approximately one year prior to that transfer, Jacalone, then the Chief of the Passaic Police Department and Failla's immediate supervisor, advised Failla that he wanted to transfer Failla to the night shift. Failla stated that he informed Jacalone of his back pain, and that Jacalone responded that the night air would "do [him] good."

Failla testified that following his transfer to the night shift, his back pain worsened. Several of Failla's co-workers also testified to his apparent discomfort on the night shift. Failla claimed that both the night air and the more strenuous duties required of the night captain aggravated his back condition. Failla also offered expert medical testimony in support of his claims. The expert testified that the cold and dampness of the night air, as well as the increased stress associated with the busier night shift, aggravated Failla's back condition. Failla requested a transfer back to a day shift on at least six occasions between 1992 and 1993. However, Failla was not reinstated to a day shift until November 1993, after he filed this suit and after Jacalone retired.

While still working the night shift, Failla initiated this action against the City, the Police Department, and Jacalone in his official and individual capacities. Failla alleged several causes of action, many of which were dismissed prior to trial. Failla proceeded to trial on his claims against all three appellants based upon their alleged violation of the LAD, and against the City and the Police Department based on their alleged violation of the

3

Americans with Disabilities Act.1 Failla contended that day shift work constituted a reasonable accommodation of his back condition.

## II.

At trial, the jury determined that Failla was not "disabled" within the meaning of the ADA, and judgment was accordingly entered in favor of the City and the Police Department on the ADA claim. The jury concluded, however, that Failla was "handicapped" within the meaning of the LAD, and that the City and the Police Department were liable for failing to accommodate Failla's handicap. The jury also concluded that Jacalone had engaged in discriminatory conduct within the scope of his employment, and the district court found him liable on that basis. The district court awarded Failla compensatory damages of $143,000, with costs. The district court denied appellants' subsequent motions for judgment as a matter of law, or in the alternative for a new trial, and awarded attorneys' fees to Failla. This appeal followed.2

II.

Appellants have appealed from multiple rulings of the district court, and different standards of review apply to different arguments that appellants have raised on appeal. Appellants' contention that Failla failed to establish a prima facie case under the LAD relates to their entitlement to judgment as a matter of law, and this court exercises plenary review over an order granting or denying a motion for judgment as a matter of law, applying the same standard as the district court. See Lightning Lube, Inc. v.

_____

1. Prior to trial, the district court granted summary judgment in favor of Jacalone on the ADA claim, finding that the ADA does not impose individual liability.

2. Failla has not cross-appealed any trial or pre-trial rulings. Failla's complaint had asserted claims pursuant to S 1983, as well as claims for punitive damages and intentional infliction of emotional distress (the district court granted summary judgment in favor of the City, the Police Department, and Jacalone on the S 1983 claims and the claims for punitive damages; summary judgment in favor of Jacalone on the emotional distress claim; judgment as a matter of law in favor of the City and Police Department on the emotional distress claim).

4

Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993). A court should grant a motion for judgment as a matter of law "only if viewing the evidence in the light most favorable to the party opposing the motion, no jury could decide in that party's favor." Walter v. Holiday Inns, Inc., 985 F.2d 1232, 1238 (3d Cir. 1993). Appellants' arguments relating to Jacalone's individual liability turn on the district court's interpretation of the effect of the jury's answers to interrogatories. We exercise plenary review over the district court's determination that the jury's findings resulted in a verdict of individual liability against Jacalone. See Bradford–White Corp. v. Ernst & Whitney, 872 F.2d 1153, 1158 (3d Cir.), cert. denied, 493 U.S. 993 (1989). Appellants' challenges to the district court's evidentiary rulings relate to their right to a new trial, and an abuse of discretion standard applies to the district court's decision to grant or deny a new trial. See Rotondo v. Keene Corp., 956 F.2d 436, 438 (3d Cir. 1992). Where, however, the district court's decision rests on the application of legal precepts, we exercise plenary review. See id. (citing Link v. Mercedes–Benz of N. Am., Inc., 788 F.2d 918, 921 (3d Cir. 1986)). Finally, in considering appellants' arguments that the district court improperly awarded attorneys' fees, we apply an abuse of discretion standard. See Rode v. Dellarciprete, 892 F.2d 1177, 1182–83 (3d Cir. 1990). The district court had jurisdiction over this case pursuant to 28 U.S.C. SS 1331, 1343, and 1367. This court has jurisdiction over this appeal pursuant to 28 U.S.C. S 1291.

III.

Appellants raise four arguments on appeal. They contend that Failla failed to establish a prima facie case under the LAD, that the district court wrongly imposed a verdict of individual liability against Jacalone, that the district court erroneously admitted evidence of a worker's compensation judgment, and that the district court improperly awarded attorneys' fees to Failla. We will address these in turn.

A.

We first consider appellants' contention that Failla failed to establish a prima facie case of discrimination under the

5

LAD. The LAD prohibits discrimination against any person who is or has been "handicapped," unless the handicap precludes the performance of employment. See N.J.S.A. S 10:5-4.1. The regulations promulgated pursuant to the statute require employers to make reasonable accommodations to the limitations of a handicapped employee unless the accommodation would impose an undue hardship on the employer. See N.J.A.C.S 13:13-2.5(b); see also Ensslin v. Township of North Bergen, 646 A.2d 452, 458-59 (N.J. Super. Ct. App. Div. 1994).

Appellants challenge two aspects of Failla's prima facie case under the LAD. First, appellants dispute thefinding that Failla was "handicapped," arguing that the jury's determination that Failla was not disabled under the ADA precluded its determination that Failla was handicapped under the LAD. Second, appellants contend that Failla failed to demonstrate any need for an accommodation. We find these arguments unpersuasive.

The meaning and propriety of the jury's verdict with respect to the ADA claims on the one hand and the LAD claims on the other turns on a review of the statutory definitions of "disability" and "handicapped." Although the words are often treated interchangeably as a matter of common usage, we have expressed some skepticism as to whether the terms, as used in the ADA and LAD, are actually equivalent. See Olson v. General Elec. Astrospace, 101 F.3d 947, 956 (3d Cir. 1996).

The ADA defines the term "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities . . . ." 42 U.S.C. S 12102(2)(A). The LAD, in contrast, applies to "handicapped" persons, defined by statute as those who suffer:

> from physical disability, infirmity, malformation or disfigurement which is caused by bodily injury, birth defect or illness including epilepsy, and which shall include, but not be limited to, any degree of paralysis, amputation, lack of physical coordination, blindness or visual impediment, deafness or hearing impediment, muteness or speech impediment or physical reliance on a service or guide dog, wheelchair, or other remedial

6

appliance or device, or from any mental, psychological, or developmental disability resulting from anatomical, psychological, physiological or neurological conditions which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques. Handicapped shall also mean suffering from AIDS or HIV infection.

N.J.S.A. S 10:5-5(q). In contrast to the ADA, the LAD definition of "handicapped" does not incorporate the requirement that the condition result in a substantial limitation on a major life activity. See Olson v. General Elec. Astrospace, 966 F. Supp. 312, 314-15 (D.N.J. 1997); Illingworth v. Nestle U.S.A., Inc., 926 F. Supp. 482, 488 (D.N.J. 1996); Gimello v. Agency Rent-A-Car Sys., 594 A.2d 264, 275 (N.J. Super. Ct. App. Div. 1991) (noting that the LAD definition of "handicapped" does not include a major life activity requirement). This lower standard under the statutory definition of "handicapped," as compared to the definition of "disability," negates any inconsistency in the jury's verdict with respect to the ADA and LAD claims, and the district court's instructions advised the jury of the different statutory definitions.

We also disagree with the second aspect of appellants' challenge to Failla's prima facie case, and find that Failla adduced sufficient evidence to support the jury'sfinding that his back condition warranted a reasonable accommodation. Appellants contend that Failla failed to present medical evidence necessary to establish that he "needed" -- as opposed to merely "wanted"-- to work a day shift. We find, however, that the evidence demonstrated that Failla suffered from a painful back condition that was aggravated by night shift work. Failla adduced expert medical testimony indicating that the dampness and coldness of the night air, as well as the increased stress associated with the busier night shift, exacerbated his condition. Furthermore, the expert testified that working the night shift would disrupt Failla's sleeping patterns, which also negatively affected his condition. The expert stated that this combination of factors combined to reduce Failla's ability to function on the night shift.

Appellants, however, contend that two aspects of that expert's testimony undermine the claimed need of an accommodation. First, the expert acknowledged that cold and damp conditions during the day would also affect Failla's back condition. He also testified, however, that it is generally more cold and humid at night. Furthermore, he offered testimony that the night shift is busier and causes a disruption in sleeping patterns.

Second, the expert stated that Failla's condition had worsened between the two occasions on which the expert examined him, even though Failla had been reinstated to a day shift in the interim. The actual effect of a transfer to a day shift on Failla's back condition, viewed in hindsight, is largely irrelevant to the question of appellants' obligation to make a reasonable accommodation at the time Failla requested the transfer. Furthermore, the expert did not address the extent to which the worsened condition reflected deterioration that occurred between the first examination and the reinstatement to a day shift, rather than between the reinstatement and the second examination. In fact, the expert specifically testified that a reduction in stress and change in schedule would make it easier for Failla to perform required activities, and Failla and other witnesses testified that his condition did improve after his reinstatement to a day shift.

Accordingly, we find that these two aspects of the expert's testimony do not negate Failla's claimed need of an accommodation. Appellants have not argued that a transfer to a day shift constitutes an unreasonable accommodation, and the evidence demonstrated that Failla suffered from a back condition that was exacerbated by night shift work.[3]

_____

3. We also reject appellants' suggestion, alluded to in this argument, that Failla failed to present evidence that his back condition precluded him from performing the essential functions of his job on the night shift. The jury was instructed that under the LAD reasonable accommodations were those that allowed a person with a disability to perform the essential functions. There was sufficient proof as to the demands of Failla's work, and as to the ways in which his condition impacted him in the performance of his work. Appellants do not challenge, nor do we address, the instructions themselves or the court's statement of the law as set forth therein.

8

We conclude that Failla adduced sufficient evidence to establish a prima facie case under the LAD.

B.

We now turn to appellants' challenge to the jury's verdict regarding the individual liability of Jacalone and the court's finding with respect thereto. Appellants raise two issues with respect to Jacalone's liability. First, they contend that the answers to interrogatories submitted to the jury do not warrant a conclusion that he is liable for aiding and abetting under S 10:5-12(e) of the LAD, and second they argue that the LAD does not contemplate the imposition of individual supervisor liability under S 10:5-12(a) of the act. We deal with the latter argument first.4

It is apparent from the district court's instructions that the issue of liability under N.J.S.A. S 10:5-12(a) was not presented to the jury, and the only issue on which the jury was instructed was Jacalone's aiding and abetting liability under N.J.S.A. S 10:5-12(e). That the jury was not asked to impose liability on the basis of S 12(a) is clear due to a variety of factors. First, the district judge stated that only if the City and the Police Department were found liable could the jury consider Jacalone's individual liability, which is a classic aiding and abetting requirement. Moreover, in explaining the elements necessary to Jacalone's liability, the district judge's discussion closely paralleled portions of the discussion of aiding and abetting liability developed by his colleague Judge Irenas in Tyson v. Cigna Corp., 918 F. Supp. 836, 839 (D.N.J. 1996). Finally, in denying appellants' motion for judgment as a matter of law, the district judge indicates that in his view S 12(e) provides the only basis for employee liability, so that he did not

_____

4. We note at the outset that there is very little New Jersey case law interpreting the relevant provisions of the LAD as applied to individual employee liability. This case again demonstrates the difficulties associated with the lack of a certification procedure in New Jersey. See Hakimoglu v. Trump Taj Mahal Assocs., 70 F.3d 291, 302 (3d Cir. 1995) (Becker, J., dissenting) (noting that "[s]tates like New Jersey lacking a certification procedure face the threat that federal courts will misanalyze
the state's law . . . .").

9

recognize the theory that individuals can be liable as "employers" under S 12(a). As the issue of the imposition of S 12(a) liability was not submitted to the jury, we need not reach this issue.

Turning to the aiding and abetting charge, as an initial matter, S 12(e) by its express terms contemplates individual liability of employees for aiding and abetting an LAD violation.5 In submitting the case to the jury, two questions were posed regarding Jacalone's conduct:

> (1) Did the plaintiff prove, by a preponderance of the evidence, that defendant Jacalone engaged in discriminatory conduct?
>
> (2) Did plaintiff prove, by a preponderance of the evidence, that defendant Jacalone was acting in the scope of his employment when he denied plaintiff a transfer to a day shift?

The court's instructions regarding these two questions were somewhat broader, indicating that Jacalone could be held liable for engaging in discriminatory conduct if the jury found that Jacalone knew that Failla was handicapped, knew that he needed an accommodation -- namely, a transfer to a day shift -- and failed to transfer him, and that he could be found to have acted in the scope of his employment if he had authority to transfer Failla and did not do so. The jury answered "yes" to both questions, and the district court concluded, based on those findings, that Jacalone had been found individually liable to Failla as an aider and abettor. Jacalone's counsel questioned that conclusion at trial and again on appeal, and argues that a finding that Jacalone acted in the scope of his employment does not lead to the imposition of individual liability.

Accordingly, we must predict whether the New Jersey Supreme Court would determine that the answers to interrogatories in this case warranted a finding of individual

_____

5. The statute provides that it shall be an unlawful employment practice or unlawful discrimination "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this act, or to attempt to do so." N.J.S.A. S 10:5-12(e).

liability against Jacalone. To resolve that question, we must consider whether the interrogatories and the corresponding instructions properly stated the law. No party has objected to the language of the interrogatories or instructions as such, although Jacalone's counsel's objection to the district court's ruling clearly calls them into question. We have discretion to review instructions, even sua sponte, if they are such that the jury was without adequate guidance on a fundamental question and our failure to consider the error would result in a fundamental miscarriage of justice. See United States v. 564.54 Acres of Land, 576 F.2d 983, 987 (3d Cir. 1978), rev'd on other grounds, 441 U.S. 506 (1979). For the reasons set forth below, we find that the jury was without adequate guidance on the question of Jacalone's individual liability, and we will exercise our discretion to review the interrogatories and instructions as part of our determination that a new trial is warranted. We will focus first on the legal relevance and appropriateness of the second interrogatory, and then the first.

In its opinion denying appellants' motion for judgment as a matter of law, the district court indicated that it viewed Tyson as setting forth the standard for aiding and abetting liability under the LAD. According to the district court's interpretation, "Tyson stands for the proposition that, under the NJLAD, a supervisory employee may be held individually liable for discriminatory acts committed in the scope of his employment." The court in Tyson cites a New Jersey Superior Court decision analogizing aiding and abetting liability under the LAD to accomplice liability in the criminal context. See 918 F. Supp. at 840 (citing Baliko v. Stecker, 645 A.2d 1218 (N.J. Super. Ct. App. Div. 1994)). The Tyson court notes that criminal accomplice liability requires a finding of shared intent: " `[t]he aider and abettor must share the same intent as the one who actually committed the offense. There must be a community of purpose between the actual perpetrator and the aider and abettor.' " Id. (quoting State v. Newell, 378 A.2d 47, 52 (N.J. Super. Ct. App. Div. 1977)). The court then reasons that because a supervisor's acts within the scope of his employment are the acts of the employer, "a supervisor who engages in discriminatory conduct while acting within the scope of his employment shares the intent and purpose of

11

the employer (the principal) and may be held individually liable (as an accomplice) for aiding and abetting the employer's unlawful conduct." Id. at 841. In contrast, a supervisor acting outside the scope of his employment "ipso facto" does not aid and abet his employer, and is therefore not subject to accomplice liability under the LAD.6 Id. Courts in other jurisdictions have endorsed a similar analysis of aiding and abetting liability under state anti-discrimination statutes. See, e.g, Glickstein v. Neshaminy Sch. Dist., No. 96-6236, 1997 WL 660636, at * 12-13 (E.D. Pa. Oct. 22, 1997).

It is apparent that this concept of shared intent was the key to the district court's view that a supervisor who commits a discriminatory act within the scope of his employment aids and abets a violation of the LAD and is subject to individual liability under S 12(e). The second interrogatory to the jury was based on this view. However, although civil aiding and abetting may to some extent be analogized to its criminal counterpart,7 the New Jersey Supreme Court has held that the element of shared intent necessary in the criminal context is not an element of aiding and abetting in the civil context. The court specifically stated that "[t]o borrow . . . from definitions of aiding and abetting liability in the criminal field, where criminal intent is stressed because the aider is a criminal principal, is entirely inappropriate in the context of the present statute which is basically a remedial, not a criminal one." Passaic Daily News v. Blair, 308 A.2d 649, 656 (N.J. 1973).8 In its only comment on the LAD aiding and abetting

_____

6. The court also concludes that, since a non-supervisory employee plays no role in his employer's reaction to his discriminatory conduct, the non-supervisory employee does not share any intent or common purpose with his employer and is therefore not liable as an aider and abettor of the employer's violation of the LAD. See Tyson, 918 F. Supp. at 840-41.

7. In Baliko, the New Jersey Superior Court states that the same meaning has applied to the terms "aid" and "abet" in both the civil and criminal contexts. See 645 A.2d at 1223 (citations omitted). The court does not, however, expressly refer to the shared intent requirement of criminal accomplice liability.

8. We note that despite their seemingly different treatment of the analogy between civil and criminal aiding and abetting liability, the decisions in

12

provision, the New Jersey Supreme Court rejected an analogy to criminal accomplice liability and its shared intent requirement. The court rebuffed a newspaper's challenge to the validity of a regulation, promulgated under the LAD, prohibiting the publication of classified employment advertisements with race, gender, or age-based headings, finding that the newspaper that printed the ads could be held liable for aiding and abetting an employer's violation of the LAD, even in the absence of shared intent or common purpose between the newspaper and employer. See id. at 656-57.

It should be noted that in Passaic Daily News, the court determined that shared intent was not necessary in order to find civil aiding and abetting, while in Tyson, the court found that the defendant's supervisory status satisfied the element of shared intent that it thought necessary for aiding and abetting liability. Taking guidance as we must from the New Jersey Supreme Court, we conclude that the issue of shared intent is irrelevant under the LAD. 9 Accordingly, the district court interrogatory to the jury as to whether Jacalone, conceded to be a supervisor, acted in the scope of his employment, was not a relevant question for purposes of determining aiding and abetting liability. The real issue then becomes what are the elements of aiding and abetting, and did the court's instructions and the

_____

Passaic Daily News and Baliko are not necessarily inconsistent. The court in Passaic Daily News referred specifically only to the intent requirement of criminal accomplice liability. See 308 A.2d at 656. In contrast, the court in Baliko does not mention the intent requirement, but focuses on the meaning of "aid" and "abet" as it relates to the assistance or encouragement that the aider or abettor provides. See 645 A.2d at 1223.

9. We note that its construction of the shared intent requirement is at the heart of the Tyson court's distinction between supervisory and non-supervisory employees. See 918 F. Supp. at 840-41. Our determination that the LAD does not include a shared intent requirement indicates that this is not a proper basis for such a distinction. Because the question of a non-supervisory employees's liability is not before us, we do not express any view on whether there is some other basis on which to distinguish between the aiding and abetting liability of supervisory and non-supervisory employees under the LAD.

13

remaining interrogatory sufficiently explore and probe the proper test.

As this court has recognized, aiding and abetting liability traditionally applies to criminal offenses and "is not a well-settled mechanism for imposing civil liability." American Tel. & Tel. Co. v. Winback & Conserve Program, 42 F.3d 1421, 1430 (3d Cir. 1994), cert. denied, 514 U.S. 1103 (1995). The New Jersey Superior Court in Baliko stated its view that the criminal law definition of the words "aid" and "abet," namely as meaning respectively " `to assist, support or supplement the efforts of another,' " and " `to encourage, counsel, incite or instigate the commission of a crime,' " should be applied in the civil context. Baliko 645 A.2d at 1223 (quoting State v. Newell, 378 A.2d 47, 52 (N.J. Super. Ct. App. Div. 1977)). In Passaic Daily News, the court only opined as to the lack of need for shared intent in the civil context, but did not otherwise discuss the elements of civil aiding and abetting. Although Passaic Daily News and Baliko provide some guidance, they fail to explore, let alone definitively establish, the full nature and scope of aiding and abetting liability under the LAD. Based on the limited available guidance, however, we conclude that the New Jersey Supreme Court would follow the Restatement of Torts to define aiding and abetting liability under the LAD.

The Restatement of Torts provides that a person is liable for harm resulting to a third person from the conduct of another when he "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself . . . ." Restatement (Second) of Torts S 876(b). Courts have recognized that this Restatement provision sets forth the standard for civil aiding and abetting liability. See Landy v. Federal Deposit Ins. Co., 486 F.2d 139, 162 (3d Cir. 1973), cert. denied, 416 U.S. 960 (1974). The New Jersey Supreme Court relied on this provision in Judson v. Peoples Bank and Trust Co., 134 A.2d 761, 767 (N.J. 1957), to determine a defendant's liability for furnishing funds to a corporation when it knew the corporate assets were being used for the personal advantage of the president and director. Federal courts have subsequently relied on Judson as evidence that New Jersey has adopted the Restatement

14

standard of civil aiding and abetting liability. See, e.g., Pereira v. United Jersey Bank, 201 B.R. 644, 671 (S.D.N.Y. 1996); Resolution Trust Corp. v. Spagnoli, 811 F. Supp. 1005, 1014 (D.N.J. 1993). In addition, a federal district court applying a New Jersey securities law relied on the elements of aiding and abetting liability derived in Landy from the Restatement. See Commodity Futures Trading Comm'n v. American Metals Exch. Corp., 775 F. Supp. 767, 782 (D.N.J. 1991), rev'd on other grounds, 991 F.2d 71 (3d Cir. 1993). In Tyson, apart from its discussion of the shared intent requirement, the court recognizes that an aider and abettor must "willfully and knowingly" associate himself with another's unlawful act. See 918 F. Supp. at 840.10

We find no reason to believe that the New Jersey Supreme Court would adopt a construction of civil aiding and abetting liability under the LAD that differs from the Restatement. Both Passaic Daily News and Baliko are consistent with this understanding of aiding and abetting. The Restatement requires that an aider and abettor knowingly give assistance or encouragement. It does not incorporate the shared intent requirement rejected in Passaic Daily News. Furthermore, the Restatement, like Baliko, focuses on whether the aider or abettor has actually provided assistance or encouragement. Accordingly, we predict that the New Jersey Supreme Court would find that an employee aids and abets a violation of the LAD when he knowingly gives substantial assistance or encouragement to the unlawful conduct of his employer. The jury in this case was asked in the first interrogatory whether Jacalone "engaged in discriminatory conduct." The district court's instruction regarding this question informed the jury that Jacalone could be found to have engaged in discriminatory conduct if he knew Failla was handicapped and needed an accommodation, but failed to transfer him. As set forth above, we have concluded that aiding and abetting requires that one know the other's conduct constitutes a breach of

---

10. We note that the district court appears to interpret Tyson as establishing that any supervisor who engages in discriminatory conduct within the scope of his employment is liable as an aider and abettor, while we view Tyson as suggesting that such a supervisor may be liable if he acts with the requisite knowledge and willfulness.

15

duty and give substantial assistance or encouragement to that conduct. The court's instruction, requiring only knowledge of Failla's circumstances of having a handicap and being in need of an accommodation, combined with inaction, falls short of this standard. The court did not advise the jury that Jacalone could be liable as an aider and abettor only if he knew the failure to accommodate Failla's handicap was a breach of his employer's duty and if his inaction actually assisted or encouraged the unlawful act.11

We note that, as the district court instructed the jury, it is fundamental to aiding and abetting liability that the aider and abettor acted in relation to a principal, here, the employer, the city. Once the city has been found liable, the issue becomes whether under S 12(e), any employee is liable for aiding and abetting. Employees are not liable as aider and abettor merely because they had some role, or knowledge or involvement. Rather, the degree of involvement, knowledge and culpability required as a basis for liability is heightened by the standard that the Restatement sets forth and we adopt. Only those employees who meet this heightened standard will be aiders and abettors. It is important that this standard be set above mere knowledge and/or implementation, lest a reverse respondeat superior liability could be created under the guise of aiding and abetting.

Accordingly, we agree with appellants that the jury's answers to interrogatories in this case were insufficient to establish Jacalone's liability as an aider or abettor. Because the interrogatories and corresponding instructions did not properly state the elements of aiding and abetting liability, we conclude that a new trial on the issue of Jacalone's

_____

11. The court in Tyson found that a failure to act cannot give rise to aiding and abetting liability. See 918 F. Supp. at 841. We decline to adopt such a per se rule regarding liability for inaction. Rather, we conclude that inaction can form the basis of aiding and abetting liability if it rises to the level of providing substantial assistance or encouragement. See Dici v. Pennsylvania, 91 F.3d 542, 553 (3d Cir. 1996) (noting that a plaintiff states a claim for aiding and abetting harassment if he alleges that a supervisor knew of the harassment but repeatedly refused to stop it).

16

individual liability is required. See NBO Indus. Treadway Cos. v. Brunswick Corp., 523 F.2d 262, 275 (3d Cir. 1975), rev'd on other grounds, 429 U.S. 477 (1977).

C.

We next consider appellants' argument that the district court committed reversible error by permitting Failla to testify that he received a worker's compensation award for a partial permanent disability and by admitting a copy of the judgment, with the amount of the award redacted, into evidence. Appellants now contend that this evidence was irrelevant and was highly prejudicial, and should have been excluded under Federal Rules of Evidence 401 and 403. At trial, appellants only argued lack of relevance (and not the application of Rule 403), and the district court determined that the evidence was relevant because it tended to prove that Failla "had something wrong with him." We cannot find the court's ruling an abuse of discretion. The test of relevance under the Federal Rules of Evidence is low. "Because [Rule 401] makes evidence relevant `if it has any tendency to prove a consequential fact, it follows that evidence is irrelevant only when it has no tendency to prove the fact.' " Blancha v. Raymark Indus., 972 F.2d 507, 514 (3d Cir. 1992) (quoting 22 Charles A. Wright & Kenneth W. Graham, Federal Practice and Procedure: Evidence S 5166, at 74 n. 47 (1978)). We cannot conclude that the district court erred in determining that the worker's compensation judgment tended to prove that Failla was disabled or handicapped. See Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1099 n.12 (3d Cir. 1995) (noting that the admission of evidence of an EEOC determination is committed to the discretion of the trial court); Dickerson v. State of N.J. Dep't of Human Serv., 767 F. Supp. 605, 612 (D.N.J. 1991) (recognizing the probative value of an EEOC determination).

Appellants raised their argument under Rule 403 for the first time on appeal.12 Accordingly, they waived any
_____

12. We note that during his opening statement, Failla's counsel referred to the amount of the worker's compensation judgment. Jacalone's

17

objection based on Rule 403, and we consider only whether the admission of the evidence constituted plain error. See Walden v. Georgia–Pacific Corp., 126 F.3d 506, 517 (3d Cir. 1997), petition for cert. filed, Feb. 17, 1998 (No. 97–1380). Rule 403 requires a balancing which the district court is in the best position to evaluate. See United States v. Gatto, 995 F.2d 449, 457 (3d Cir.), cert. denied, 510 U.S. 948 (1993). "[W]hen a trial court is not given an opportunity to exercise its discretion in striking the balance, we will seldom find plain error . . . ." Id. On appeal, appellants have not even argued that the admission of the evidence constitutes plain error, and we do not find plain error here.

Appellants also object to the admission of this evidence based on several arguments that might be worthy of consideration if the district court had given collateral estoppel effect to the worker's compensation determination of Failla's disability.13 However, that was not the case and the district court so stated. It was clear that the district court admitted evidence of the worker's compensation

_____

counsel objected, without stating the grounds for the objection, and the district court sustained the objection and instructed the jury to disregard the statement. Immediately after the opening statements, however, the district court clearly explained that it sustained the objection only because counsel referred to the amount of the award, but that reference to the mere fact that Failla collected worker's compensation would be admissible. Appellants did not raise any objection at that time, or when Failla testified. At the close of Failla's case, his counsel requested that the district court take judicial notice of
the judgment, and Jacalone's counsel objected on relevancy grounds. Appellants' counsel did not articulate any further objection to the evidence until just prior to the closing arguments, at which time Jacalone's counsel asserted that he had objected to the evidence throughout the trial. Even at that time, however, he did not contend that the evidence was unduly prejudicial under Rule 403.

13. Appellants argue that the standard of proof in a worker's compensation proceeding differs from the standard of proof in this civil action, and that Jacalone was not a party to the worker's compensation proceedings. Even the cases appellants cite on appeal in support of these arguments are directed at collateral estoppel issues. See City of Hackensack v. Winner, 410 A.2d 1146 (N.J. 1980); Ensslin v. Township of North Bergen, 646 A.2d 452 (N.J. Super. Ct. App. Div. 1994).

18

judgment merely as evidence tending to show that Failla was disabled or handicapped, not for collateral estoppel purposes. Accordingly, appellants' arguments are misplaced, and we find no grounds for reversible error in the district court's admission of evidence relating to the worker's compensation judgment.14

D.

Finally, we address appellants' challenges to the district court's award of attorneys' fees. Appellants assert this argument by incorporating by reference arguments offered to the district court in opposition to Failla's fee petition. We have reviewed the record before the district court, in which appellants disputed Failla's counsel's billing rate, the number of hours reasonably expended on the case, and the award of a contingency enhancement. Notwithstanding appellants' failure to adequately articulate and support their arguments on appeal with reference to the proper standard of review, we have reviewed the district court's fee award and conclude that the district court did not abuse its discretion.15

_____

14. We do note that the evidence of the worker's compensation judgment was cumulative of Failla's expert witness testimony. However, we find that the district court did not abuse its discretion in refusing to grant a new trial on this basis. See Threadgill v. Armstrong World Indus., Inc., 928 F.2d 1366, 1370 (3d Cir. 1991).

15. Specifically, we find no abuse of discretion in the district court's determination of the lodestar or the contingency enhancement. With respect to the lodestar, we find that the district court did not abuse its discretion in setting the hourly rate or in declining to reduce the number of hours reasonably expended on the litigation. We reject appellants' argument that the district court should have deducted time to reflect Failla's unsuccessful claims and his limited success. Although Failla did not succeed on every claim originally asserted in his complaint, the successful and unsuccessful claims all arose from a common core of fact. Compare Rendine v. Pantzer, 661 A.2d 1202, 1226 (N.J. 1995) (quoting Rode, 892 F.2d at 1177) (noting that a court may reduce the claimed hours to reflect unsuccessful claims that are distinct in all respects from successful claims). Furthermore, the jury awarded Failla $143,000 in compensatory damages and the district court found that the verdict represented a significant vindication of civil rights. In these

19

We also reject the tenor of appellants' sparse discussion of the fee issue in its brief on appeal, which urges that we reverse the fee award because the district court should have considered the City's status as a public entity, and should not have viewed it as a "deep pocket." Appellants cite no cases in support of this argument, and wefind the City's public status entirely irrelevant. The LAD provides that attorneys' fees may be awarded to prevailing parties without any reference to the losing party's ability to pay. See N.J.S.A. S 10:5-27.1. The mere fact that the City is a public entity does not relieve it of its obligation to pay attorneys' fees when it is found liable for unlawful discrimination. See Robb v. Ridgewood Bd. of Educ., 635 A.2d 586 (N.J. Super. Ct. Ch. Div. 1993) (awarding attorneys' fees against a local school board). Accordingly, we find no abuse of discretion in the district court's award of attorneys' fees.

IV.

For the foregoing reasons, we will reverse in part the district court's order denying appellants' motions for judgment as a matter of law or for a new trial, insofar as the district court found that individual liability should be imposed on Jacalone. We will affirm that order in all other respects, and will affirm the district court's award of attorneys' fees. We will affirm the judgment entered against the City and Police Department. We will vacate the judgment entered against Jacalone, and remand for further proceedings consistent with this opinion.

_____

circumstances, the district court was not required to reduce the lodestar to reflect any "limited" success. Furthermore, we find that the time records -- which chronologically identified various activities and the time expended by particular attorneys -- were sufficiently specific under Rendine because they enabled the district court to determine the nature of the services for which compensation was sought. See id. at 1227 (quoting Lindy Bros. Builders v. American Radiator & Standard Sanitary Corp., 487 F.2d 161, 167 (3d Cir. 1973)). Finally, the court's award of a thirty-five percent contingency enhancement is within the range identified by Rendine for typical cases. See id. at 1231.

20

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit