754 A.2d 1244 (2000)
333 N.J. Super. 219
Larry J. GARDENHIRE, Plaintiff,
v.
NEW JERSEY MANUFACTURERS INSURANCE COMPANY, Dawn M. Melchiore, Emcore Corporation, Paul Rotella, Carol Gulatta, Ed Wolak, David Belsford, Todd Ambrose, Bob Piperato, Sean Hargey, and Mike Pelczynski, Defendants.
Superior Court of New Jersey, Law Division, Middlesex County.
Decided April 5, 2000.
*1245 Larry Gardenhire, plaintiff pro se.
Rosemary Bruno, Elizabeth Kenny, New Jersey Manufacturers, Dawn Melchiore (Carpenter, Bennett & Morrissey), Newark, for the defendants.
GARRUTO, J.S.C.
This matter comes before the court upon motion of defendants New Jersey Manufacturers Insurance Company ("NJM") and Dawn Melchiore ("Melchiore") for summary judgment on plaintiff's complaint. The sole issue for adjudication before this court is whether a workers' compensation adjuster's conduct in investigating and recommending denial of plaintiff's workers compensation claim was a violation of the aiding and abetting provisions under the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5-1-10:5-42. For reasons set forth herein, defendants' motion is granted.
Plaintiff Larry Gardenhire ("Gardenhire"), an African-American, was employed at Emcore Corporation ("Emcore") *1246 from the Spring of 1996 until April 10, 1997. Plaintiff alleges that during his employment with Emcore, he was subjected to racial harassment by his co-employees and supervisors. On or about February 6, 1997, plaintiff left a note at the desk of Andy Powers (one of his supervisors) stating that he needed a doctor because he felt faint, dizzy, and overwhelmed. Plaintiff denies ever telling Mr. Powers that his injuries were work-related. Plaintiff testified: "[t]hat day I was about to explode, and I didn't talk much. I just wanted to see a doctor, and when I got to the doctor, I exploded." Plaintiff was taken to Medimerge by a co-worker where Dr. Pilla diagnosed plaintiff with acute stress reaction, prescribed medication, and advised him to go home and rest for a few days. Plaintiff began seeing an employee therapist on a regular basis approximately two weeks after this incident.
On or about March 4, 1997, NJM, Emcore's workers compensation insurance carrier, received a telephone call from Mr. Powers stating that Gardenhire was allegedly suffering an acute stress reaction as a result of his work environment. Melchiore, a workers' compensation adjuster employed by NJM, was assigned to investigate whether plaintiff's medical expenses were covered by NJM's workers' compensation policy. On March 11, 1997, Melchiore went to Emcore where she toured the facility, examined plaintiff's work station, and spoke with plaintiff's supervisor, Carol Gulatta ("Gulatta"), the human resources department, and Mr. Powers regarding plaintiff's claim.
Melchiore also interviewed plaintiff in the presence of Gulatta and Melchiore's associate, Tara Modilawnie. Although Ms. Melchiore indicated that she identified herself as an NJM employee, plaintiff alleges that Melchiore never mentioned that she was investigating his workers compensation claim. Rather, plaintiff states that he was under the impression that Melchiore was present to investigate his racial harassment and hostile workplace complaints. During this meeting, Melchiore queried plaintiff about his personal, family and work environment. Plaintiff states that he told Melchiore that he was being harassed on the job by co-employees, that his supervisor was involved in the harassment, that racial remarks were made, that his car had been vandalized and that the police department had been called. Melchiore took a statement from plaintiff, which he read and signed.
Melchiore did not find that plaintiff's work environment substantially contributed to his condition. In a March 11, 1997 report to her supervisor, Melchiore concluded that there were no objective findings about plaintiff's job to satisfy the criteria for a compensable stress claim under the workers' compensation laws.[1] Melchiore found that plaintiff had work performance problems in the past, and was issued written warnings and one transfer as a result of his poor performance. Melchiore also determined that three other Emcore employees did the same job as plaintiff, and that none of them had stress claims. Lastly, Melchiore reported that plaintiff's supervisors felt that there was no racial harassment at Emcore and that plaintiff's co-employees were resentful of his poor performance.
By letter of March 18, 1997, NJM denied coverage for plaintiff's medical treatments for stress, stating that the information obtained failed to indicate that the employee was suffering from a compensable condition arising out of, and in the course of his employment. In a subsequent recorded conversation with plaintiff, Melchiore stated that the purpose of her *1247 investigation was to determine whether Gardenhire's stress was directly related to his job, and that his claim did not meet eligibility standards set forth by workers compensation laws. On April 10, 1997, Emcore terminated plaintiff's employment.
On June 1, 1997, plaintiff filed suit against his employer, Emcore Corporation ("Emcore") and eight supervisors and coworkers, alleging racial harassment by coworkers and supervisors, constructive discharge, hostile work environment and retaliation for requesting workers compensation benefits, in violation of the LAD, N.J.S.A. 10:5-1-10:5-42. In addition, plaintiff sued NJM and Melchiore, under N.J.S.A. 10:5-12(e), for aiding and abetting Emcore in discriminating against plaintiff.
Plaintiff resolved his claims against Emcore and its employees on January 13, 2000. The remaining defendants, Melchiore and NJM, now move for summary judgment to dismiss plaintiff's allegations that they aided and abetted Emcore in discriminating against plaintiff. Plaintiff argues that Melchiore and NJM participated in a malicious workers compensation investigation and improperly denied his claims, covered up his complaints of discrimination against Emcore and further exacerbated co-worker hostility against him. Melchiore and NJM assert that plaintiff has no factual or legal basis to support his claims.
There is no exacting case law or express statutory provision for workers compensation carrier liability under the LAD. However, N.J.S.A. 10:5-12(e) and N.J.S.A. 10:5-5(a) by their terms, contemplate liability for any person, including third parties such as workers compensation carriers that may aid and abet an employer in discriminating against an employee. N.J.S.A. 10:5-12(e) provides that it shall be an unlawful employment practice or unlawful discrimination when any person aids, abets, incites, compels or coerces the doing of any act prohibited by the LAD. N.J.S.A. 10:5-5(a) further defines "person" to include one or more individuals, partnerships, associations, organizations, labor organizations, corporations, legal representatives, trustees, trustees in bankruptcy, receivers, and fiduciaries.
Case law and canons of statutory construction also advise this court's decision. In Connecticut National Bank v. Germain, 503 U.S. 249, 253-54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391, 397 (1992), the United States Supreme Court reiterated the universal canon of statutory construction that unambiguous statutory language must be read according to its plain meaning. In interpreting a statute, a court must presume that "a legislature says in a statute what it means and means in a statute what it says there." Id. at 254, 112 S.Ct. at 1149, 117 L.Ed.2d at 397 (citing United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241-42, 109 S.Ct. 1026, 1030-31, 103 L.Ed.2d 290 (1989); United States v. Goldenberg, 168 U.S. 95, 102-03, 18 S.Ct. 3, 4, 42 L.Ed. 394 (1897); Oneale v. Thornton, 6 Cranch 53, 68, 10 U.S. 53, 3 L.Ed. 150 (1810)). "When the words of a statute are unambiguous, then, this first canon is also the last: `judicial inquiry is complete.'" Ibid. (citing Rubin v. United States, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981); Ron Pair Enters., supra, 489 U.S. at 241, 109 S.Ct. at 1030,103 L.Ed.2d 290).
The New Jersey Supreme Court has emphasized repeatedly that "[i]n the interpretation of a statute our overriding goal has consistently been to determine the Legislature's intent." Young v. Schering Corp., 141 N.J. 16, 25, 660 A.2d 1153 (1995) (quoting Roig v. Kelsey, 135 N.J. 500, 515, 641 A.2d 248 (1994)). Where the Legislature's intent is remedial, a court should construe a statute liberally. Ibid. (citing Brookins v. Murray, 131 N.J. 141, 149, 619 A.2d 583 (1993); Torres v. Trenton Times Newspaper, 64 N.J. 458, 461, 317 A.2d 361 (1974)). New Jersey has historically been "in the vanguard in the fight to eradicate the cancer of unlawful discrimination of all types from our society." Peper v. Princeton Univ., 77 N.J. 55, 80, 389 A.2d 465 (1978). "[T]he overarching goal of the [LAD] is nothing less *1248 than the eradication `of the cancer of discrimination.' "Dale v. Boy Scouts of Am., 160 N.J. 562, 584-85, 734 A.2d 1196 (1999), cert. granted, ___ U.S.___, 120 S.Ct. 865, 145 L.Ed.2d 725 (2000) (No. 99-699, 2000 Term) (citing Fuchilla v. Layman, 109 N.J. 319, 334, 537 A.2d 652, cert. denied, 488 U.S. 826, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988) (quoting Jackson v. Concord Co., 54 N.J. 113, 124, 253 A.2d 793 (1969)). In furtherance of its purpose to root out discrimination, the Legislature has directed that the LAD "shall be liberally construed." Id. at 585. Courts have adhered to that legislative mandate by historically and consistently interpreting the LAD "with that high degree of liberality which comports with the preeminent social significance of its purposes and objects." Ibid. (citing Andersen v. Exxon Co., 89 N.J. 483, 495, 446 A.2d 486 (1982), aff'g in part and rev'g in part, 117 N.J. 539, 569 A.2d 793 (1990) (quoting Passaic Daily News v. Blair, 63 N.J. 474, 484, 308 A.2d 649 (1973))). The policy emanates not only from legislation but from fundamental guarantees of our Constitution. Erickson v. Marsh & McLennan Co., Inc., 227 N.J.Super. 78, 84, 545 A.2d 812 (App.Div. 1988), rev'd in part on other grounds, 117 N.J. 539, 569 A.2d 793 (1990) (citing N.J.S.A. 10:5-4 et seq.; Peper v. Princeton Univ. Bd. of Trustees, supra, 77 N.J. at 79-80, 389 A.2d 465.) The LAD is to be liberally interpreted with due regard for "its remedial nature" and "humanitarian concerns." Estate of Behringer v. Medical Ctr. at Princeton, 249 N.J.Super. 597, 643, 592 A.2d 1251 (citing Panettieri v. C.V. Hill Refrig., 159 N.J.Super. 472, 483, 388 A.2d 630 (App.Div.1978)).
Thus, as an undisputed initial matter, this court finds that Melchiore and NJM may be potentially liable under N.J.S.A. 10:5-12(e) for aiding and abetting an alleged LAD violation against plaintiff. The outcome of this motion, then, turns on whether Melchiore and NJM's actions satisfy the elements of aider and abettor liability under the LAD.
New Jersey state courts have not specifically addressed the subject of third party liability under the LAD's aiding and abetting provision. The Third Circuit and the United States District Court for the District of New Jersey, however, set forth an instructive standard in Failla v. City of Passaic, 146 F.3d 149 (3d Cir.1998), and Hurley v. Atlantic City Police Department, 174 F.3d 95 (3d Cir.1999), cert. denied, ___ U.S.___, 120 S.Ct. 786, 145 L.Ed.2d 663 (2000).
In Failla, 146 F.3d at 158, the Third Circuit, upon examination of Tyson v. CIGNA Corp., 918 F.Supp. 836 (D.N.J.1996), aff'd, 149 F.3d 1165 (3d Cir.1998), Passaic Daily News v. Blair, 63 N.J. 474, 308 A.2d 649 (1973), and Baliko v. Stecker, 275 N.J.Super. 182, 645 A.2d 1218 (App.Div. 1994), appeal after remand, 322 N.J.Super. 261, 730 A.2d 895, certif. denied, 162 N.J. 199, 743 A.2d 851 (1999), predicted that the New Jersey Supreme Court would incorporate Restatement (Second) of Torts § 876(b)[2] into N.J.S.A. 10:5-12(e) and find that a person is liable for harm resulting to a third person from the conduct of another when "one know[s] the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to that conduct." Relying upon Dici v. Commonwealth of Pennsylvania, 91 F.3d 542, 553 (3d Cir.1996), the Failla court denied summary judgment to a supervisor on plaintiff's claim under § 12(e) of the LAD.[3]Id. n. 11. The court further *1249 predicted that inaction could form the basis of aiding and abetting liability if it rose to the level of "providing substantial assistance or encouragement." Id. at 158. The court stated that plaintiff's supervisor could be liable for aider and abettor liability only if he knew that the failure to accommodate plaintiff was a breach of his employer's duty and if his inaction actually assisted or encouraged the unlawful act. Ibid. The Failla court, however, refused to impose liability merely because a third party had some knowledge of the alleged illegal activity. Id. at 159. Instead, the court noted that the extent of knowledge required for § 12(e) liability is heightened by the Restatement standard. Ibid. "Only those [parties] who meet this heightened standard will be aiders and abettors." Ibid.
In Hurley v. Atlantic City Police Department, 174 F.3d 95 (3d Cir.1999), the Third Circuit further elucidated § 12(e) liability when it detailed the elements of aiding and abetting as set forth in the Restatement of Torts. In holding that the district court erred in charging the jury with respect to defendants' potential liability under the LAD, the Third Circuit stated: "Based on Restatement § 876(b), courts have determined that the tort of aiding and abetting involves three elements: `(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation.'" Id. at 127 (citing Halberstam v. Welch, 705 F.2d 472, 477 (D.C.Cir.1983), In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig., 113 F.3d 1484, 1495 (8th Cir.1997), Metge v. Baehler, 762 F.2d 621, 624 (8th Cir.1985), cert. denied, 474 U.S. 1072, 106 S.Ct. 832, 88 L.Ed.2d 804 (1986).
Today, this court adopts the Third Circuit's analysis of § 12(e) liability in Failla and Hurley. Accordingly, the query becomes whether Melchiore's and NJM's actions and/or inactions meet the elements of aider and abettor liability as set forth in § 876(b) of the Restatement. This court is also subject to summary judgment guidelines set forth in Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536, 666 A.2d 146 (1995) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)), where the motion judge must consider whether the evidence when viewed in the light most favorable to the nonmovant, "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."
This court finds that summary judgment is warranted in this case. Plaintiff may be able to demonstrate that Emcore had unlawfully discriminated against and injured him. Certainly, plaintiff can establish that Melchiore was put on notice of the racial harassment and the resultant environmental and psychological stress on his person during the March 11, 1997 interview. However, plaintiff does not present any competent evidence that Melchiore had any role as part of an overall scheme to discriminate against him or that Melchiore knowingly and substantially assisted Emcore in discriminating against him. The mere purpose of Melchiore's investigation was to determine whether plaintiff sustained an injury "arising out of and in the course of his employment" N.J.S.A. 34:15-1.
*1250 The Hurley court lists five factors that help determine whether a defendant provided "substantial assistance" to the principal violation: "the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind." 174 F.3d at 127 n. 27 (citing Restatement (Second) of Torts § 876(b) cmt. d. (1979)). Additionally, the court cited Halberstam, supra 705 F.2d at 484, which provided a sixth factor, the duration of the assistance provided. Ibid.
Aiding and abetting discrimination is no less caustic than committing the actual discriminatory act itself. There is no question that the nature of the alleged encouraged act is egregious. Our Legislature has declared that "discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State." Dale, 160 N.J. at 584, 734 A.2d 1196 (citing N.J.S.A. 10:5-3). However, analysis of the remaining factors proves fatal to plaintiff's case. Plaintiff simply asserts that Melchiore conducted an improper investigation in violation of applicable workers compensation laws because she demonstrated deliberate indifference to his complaints of injury. Plaintiff further argues that Melchiore's wrongful denial of his claim encouraged Emcore's employees and management to continue their racial harassment against him. However, plaintiff is unable to offer proof of the above stated allegations. An unsubstantiated allegation of an improper workers compensation investigation does not implicate § 12(e) liability as such conduct by itself does not rise to the amount of assistance required to be deemed "aiding and abetting." It is also noted that plaintiff did not appeal Melchiore and NJM's decision by filing a formal petition with the workers' compensation court.[4] Additionally, plaintiff himself testified that Melchiore was not present at, and did not participate in any of the alleged harassment or discriminatory incidents at Emcore. Lastly, Melchiore was neither an Emcore employee or supervisor, nor did she interact with plaintiff except in context of the workers' compensation claim.
Accordingly, summary judgment is granted in favor of NJM and Melchiore. Plaintiff's claim for punitive damages are also dismissed as there exist no claims for compensatory damages against NJM and Melchiore.
NOTES
[1] In her report, Melchiore wrote:

I feel that most of the problems in this stress related case area [sic] subjective. There is [sic] no objective findings in this job. Per the firm, they do have about six months to complete one job and if the job is done correctly there is no high stress for a deadline for the manufacturing plant. There might be stress due to his poor work performance, however it is not an objective stress that is being felt by this individual. At this time, I suggest we deny this claim and refer the claimant to pursue his medical through his personal health care.
[2] The Restatement (Second) of Torts § 876(b) "provides that a person is liable for harm resulting to a third person from the conduct of another when he knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."
[3] In Dici v. Pennsylvania, 91 F.3d 542 (3d Cir.1996), the plaintiff, who had been denied workers compensation benefits for alleged psychic injuries resulting from sexual and racial harassment, brought action against her employer under Title VII and the Pennsylvania Human Relations Act. This court notes that N.J.S.A. 10:5-12(e) is virtually identical to § 955(e) of the Pennsylvania Human Relations Act. The Pennsylvania Human Relations Act states in relevant part:

It shall be an unlawful discriminatory practice... for any person, employer, employment agency, labor organization or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the provisions of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be an unlawful discriminatory practice."
43 P.S. § 955(e).
[4] The exclusivity doctrine of the Workers' Compensation Act is not a bar to recovery in a collateral action against the employer where intentional acts by co-workers or the employer cause psychological disability to the employee. Schmidt v. Smith, 294 N.J.Super. 569, 584, 684 A.2d 66 (App.Div. 1996), aff'd, 155 N.J. 44, 713 A.2d 1014 (1998). The Schmidt case states in pertinent part:

Clearly, there is no language in the LAD that mandates that claims made by employees against employers under it may only be brought under the Workers' Compensation Act. N.J.S.A. 10:5-1 to 42. Indeed, the Legislature's intent in enacting the LAD appears otherwise. Its intent was to have the LAD broadly applied and liberally construed. The pertinent portion of the act provides: Such harms have under common law given rise to legal remedies including compensatory and punitive damages. The legislature intends that such damages be available to all persons protected by this act and that this act be liberally construed in combination with other protection available under the laws of this state. N.J.S.A. 10:5-3. Further, the LAD was specifically amended in 1990 to grant a plaintiff under the Act the right to a jury trial. L.1990 c. 12. If the Legislature had intended workers compensation to be the exclusive remedy for victims of harassment and discrimination in the workplace it would not have provided for a jury trial as well as compensatory and punitive damages.
Id. at 585, 684 A.2d 66.